STATE OF CONNECTICUT *v.* JOHN J. MCGANN
(12065)

HEALEY, SHEA, DANNEHY, CALLAHAN and GLASS, Js.

Argued December 3, 1985—decision released March 18, 1986

*Todd D. Fernow,* with whom were *Michael R. Sheldon* and, on the brief, *Diane L. Welch,* certified legal intern, for the appellant (defendant).

*C. Robert Satti, Sr.,* state's attorney, with whom were *Michael L. Regan,* assistant state's attorney, and *James T. Scully,* legal intern, for the appellee (state).

SHEA, J. The defendant was found guilty of capital felony murder in violation of General Statutes § 53a-54b (2)[1] after a trial to a court composed of three

---

[1] "[General Statutes] Sec. 53a-54b. CAPITAL FELONY DEFINED. A person is guilty of a capital felony who is convicted of any of the following: (1) Murder of a member of the division of state police within the department of public safety or of any local police department, a chief inspector or inspector in the division of criminal justice, a sheriff or deputy sheriff, a constable who performs criminal law enforcement duties, a special policeman appointed under section 29-18, an official of the department of correction authorized by the commissioner of correction to make arrests in a correctional institution or facility, or of any fireman, as defined in subsection (10) of section 53a-3, while such victim was acting within the scope of his duties; (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain; (3) murder committed by one who has previously been convicted of intentional murder or murder

judges pursuant to General Statutes § 53a-45 (b). The court found no mitigating factor set forth in subsection (f) of General Statutes § 53a-46a[2] that would bar

committed in the course of commission of a felony; (4) murder committed by one who was, at the time of commission of the murder, under sentence of life imprisonment; (5) murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety; (6) the illegal sale, for gain, of cocaine, heroin or methadone to a person who dies as a direct result of the use by him of such cocaine, heroin or methadone, provided such seller was not, at the time of such sale, a drug-dependent person; (7) murder committed in the course of the commission of sexual assault in the first degree; (8) murder of two or more persons at the same time or in the course of a single transaction."

See Public Acts 1973, No. 73-137, § 3.

[2] General Statutes § 53a-46a provides in part: "(f) The court shall not impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict, as provided in subsection (d), that any mitigating factor exists. The mitigating factors to be considered concerning the defendant shall include, but are not limited to, the following: That at the time of the offense (1) he was under the age of eighteen or (2) his mental capacity was significantly impaired or his ability to conform his conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution or (3) he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution or (4) he was criminally liable under sections 53a-8, 53a-9 and 53a-10 for the offense, which was committed by another, but his participation in such offense was relatively minor, although not so minor as to constitute a defense to prosecution or (5) he could not reasonably have foreseen that his conduct in the course of commission of the offense of which he was convicted would cause, or would create a grave risk of causing, death to another person.

"(g) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury or, if there is no jury, the court finds by a special verdict as provided in subsection (d) that (1) the defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense;

imposition of the death penalty, nor any aggravating factor set forth in subsection (g) thereof that must be present in order to impose the death penalty. Accordingly, the court sentenced the defendant to life imprisonment in accordance with subsection (e) thereof. On appeal the defendant has raised two claims of error: (1) that the court erred in permitting the alternate grand jurors to remain in the grand jury room during the deliberation phase of the grand jury proceeding; and (2) that there was insufficient evidence to support the finding that he was "hired to commit [the murder] for pecuniary gain," as required to constitute the offense of capital felony murder as charged in the indictment. We find error only in the finding that the defendant was guilty of capital felony murder and modify the judgment to a conviction of the lesser included offense of intentional murder in violation of General Statutes § 53a-54a.

I

The defendant claims that his conviction should be set aside because two alternate grand jurors were permitted by the court, *Spallone, J.*, to remain in the grand jury room during the deliberative phase of the proceeding in which he was indicted after the presentation of evidence had been completed. The court did advise, however, that the alternates were not "to confer or participate with the other members." The defendant excepted to this instruction, referring specifically to the prohibition in Practice Book § 609 against the presence of anyone but the grand jurors during deliberations, but the court refused to correct it, construing General Statutes § 54-45 to allow the procedure. We

or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

agree with the defendant that the alternate grand jurors should have been excluded during deliberations. We conclude, however, that such a deficiency in the ascertainment of probable cause, absent a showing of prejudice resulting therefrom, does not warrant overturning the conviction of one who has been found guilty of a crime after a fair trial on the merits.

General Statutes § 54-45 requires alternate grand jurors to be sworn separately and directs that they "not counsel or confer with members of the regular panel as to any matters before the grand jury unless they become a part of the regular panel . . . . They shall attend the sessions of the grand jury and shall be seated with or near the members of the regular panel, with equal opportunity to see and hear all matters adduced in the proceedings. . . ." The statute makes no express provision for dismissal of alternate grand jurors at the time of deliberations, as General Statutes § 54-82h (c) does for alternates serving on a petit jury. Practice Book § 609,[3] however, provides that "[n]o persons other than the jurors may be present while the grand jury is deliberating or voting." We reject the contention of the state that the word "jurors" in this rule was intended to include alternate grand jurors as well as regular members of the panel. The purpose of the rule, to ensure against outside influences upon those actually charged with the responsibility of voting upon an indictment, can best be implemented by excluding alternates as well as all other persons from being present during the deliberative phase of the grand jury proceeding.

[3] Because constitutional grand juries are no longer required in this state, Practice Book § 609 was repealed on October 1, 1984. See article seventeenth of the amendments to the Connecticut constitution (1965), adopted in the November, 1982 general election; see also *State* v. *Sanabria,* 192 Conn. 671, 474 A.2d 760 (1984).

The defendant relies upon the first opinion published in the case of *State* v. *Washington,* 42 Conn. L.J. No. 1, p. 10A (1980), where the court originally set aside a conviction because the presence of alternates on a petit jury, which the trial court had permitted to discuss the evidence during the course of the trial, might have resulted in the participation of the alternates in such discussions. We need not consider the soundness of the reasoning of this opinion, which was later superseded by the official opinion in *State* v. *Washington,* 182 Conn. 419, 438 A.2d 1144 (1980), because of the substantial distinction in the function of a grand jury as compared to a petit jury. An indictment by a grand jury follows upon a finding of probable cause to believe a defendant has committed the offense. A conviction after a trial to a petit jury or to a court requires a finding of guilt beyond a reasonable doubt. This difference in function has led to the frequent refusal of appellate courts to set aside convictions for deviations from proper procedure in grand jury proceedings that would require reversal if they had occurred in a trial on the merits. Thus, an indictment may not be challenged because of the inadequacy or incompetency of the evidence adduced at the grand jury hearing. *Costello* v. *United States,* 350 U.S. 359, 364, 76 S. Ct. 406, 100 L. Ed. 397 (1956). Even where an indictment is based on evidence obtained in violation of a constitutional right it may stand. *United States* v. *Blue,* 384 U.S. 251, 255, 86 S. Ct. 1416, 16 L. Ed. 2d 510 (1966). An erroneous instruction relating to the presumption of innocence given to a grand jury does not invalidate the indictment, though the same instruction to a petit jury might well require a new trial. *State* v. *Stepney,* 181 Conn. 268, 283–84, 435 A.2d 701 (1980), cert. denied, 449 U.S. 1077, 101 S. Ct. 856, 66 L. Ed. 2d 799 (1981); see *State* v. *Stankowski,* 184 Conn. 121, 153–54, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596,

70 L. Ed. 2d 588 (1981). Even where the exclusion of a defendant from the grand jury proceeding because of his status as an attorney is characterized as an abuse of discretion, it is of no avail to a defendant who has been convicted unless it is shown that harm has resulted. *State* v. *Avcollie,* 188 Conn. 626, 633, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983).

The defendant cites numerous cases in which Rule 6 (d) of the federal rules, which is similar to Practice Book § 609 in prohibiting the presence of anyone but the grand jurors during deliberations and voting, has been applied to require a dismissal of the indictment, where the rule is breached, without the necessity of showing prejudice. *United States* v. *Computer Sciences Corporation,* 511 F. Sup. 1125, 1144 (E.D. Va. 1981); *United States* v. *Furman,* 507 F. Sup. 848, 854 (D. Md. 1981); *United States* v. *Treadway,* 445 F. Sup. 959, 962 (N.D. Tex. 1978); *United States* v. *Bowdach,* 324 F. Sup. 123, 124 (S.D. Fla. 1971). Most of the dismissals have occurred, however, in the trial court prior to a judgment of conviction following a trial on the merits. *United States* v. *Lill,* 511 F. Sup. 50, 61 (S.D. W. Va. 1980). The majority of state courts that have considered the question hold that the presence of an unauthorized person during the grand jury proceeding is not a sufficient basis for dismissing an indictment in the absence of prejudice to the accused. Annot., 23 A.L.R.4th 397, 404–408.

It is only a violation of the most sacrosanct of constitutional rights in the indicting process, such as racial discrimination in the composition of the grand jury, that can justify the illogic of remanding a case to redetermine whether there is probable cause to prosecute a defendant whose guilt after a fair trial has been found beyond a reasonable doubt. See *Vasquez* v. *Hillery,* 474 U.S. 254, 106 S. Ct. 617, 622–23, 88 L. Ed. 2d 598

(1986); *Rose* v. *Mitchell,* 443 U.S. 545, 551–59, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979). Even in this limited context the practice has been questioned. *Vasquez* v. *Hillery,* supra, 626–34 (Powell, J., dissenting); *Rose* v. *Mitchell,* supra, 574–89 (Stewart and Powell, Js., concurring); *Cassell* v. *Texas,* 339 U.S. 282, 302, 70 S. Ct. 629, 94 L. Ed. 839 (1950) (Jackson, J., dissenting). We can perceive no violation of any constitutional right in the presence of two superfluous grand jurors during the deliberations of the regular panel. We have no reason to presume that the two alternate grand jurors violated the court's instruction not "to confer or participate with the regular members." The rule of practice limiting attendance to regular grand jurors at that stage of the proceeding does not create a constitutional right. Accordingly, despite the failure of the court to follow the rule, the conviction of the defendant should not be set aside because of this impropriety in the absence of a demonstration of prejudice.

## II

The indictment charged that Geraldine Burke hired the defendant "for his pecuniary gain, for the purpose of causing the death of her husband, Donald C. Burke," and that Donald C. Burke was murdered in Waterford on or about August 9, 1981, "by a person or persons, including [the defendant], which person or persons with intent to cause the death of Donald C. Burke, caused the death of said Donald C. Burke." From the evidence presented in support of this charge the trial court could reasonably have found the following facts:

Geraldine Burke wanted to have her second husband, Donald Burke, to whom she had been married for two years, killed because of his claimed maltreatment of her. They continued to live in the same house, however, with their respective children from prior marriages. Geraldine enlisted the aid of her daughter, Tammy

Pate, to find someone willing to commit the murder. Tammy, who had recently returned from Florida at her mother's request, began to date the defendant in July, 1981. He visited her frequently at the house in Waterford where she lived with her mother. In the course of these visits Geraldine frequently discussed her marital problems with the defendant and, as their acquaintance developed, she ultimately inquired whether he knew anyone she could pay to kill her husband. Some time later the defendant told her that he had found a person named George Rooney who "would do the job or see that it was done" for $4000.

On July 20, 1981, Geraldine borrowed $3500 from a neighbor, which she gave to the defendant with the understanding that he would advance the balance of $500 needed to pay Rooney. The defendant had previously spoken with Rooney about the killing, but the price quoted was $3000 rather than $4000 as the defendant had informed Geraldine. The defendant paid Rooney $3000 in two installments, secretly retaining the additional $500 that he had received. Rooney accepted the money without any intention of fulfilling his agreement.

It had been planned that Donald Burke would be murdered while Geraldine was in the hospital receiving medical treatment. Because her husband, the intended victim, was still alive when she was released from the hospital, Geraldine became upset about the delay and anxious about repaying her debt to the neighbor. She discussed her concern with the defendant, who had assured her while she was in the hospital that she would not be "ripped off" and that her husband would be killed even if the defendant had to do it himself. The defendant contacted Rooney on several occasions to inquire "when the job would be done." When it appeared that Rooney was "stalling" him, the defend-

ant, as Geraldine had requested, demanded the return of the money he had paid to Rooney.

On August 8, 1981, Geraldine, her daughter, Tammy, and the defendant met at the home of his friend, James Hope, with whom he was planning to travel to California. Using Hope's telephone, the defendant made a call to Rooney, asking for the return of the money he had paid. Rooney said he would return the money, but that it would take "approximately a week to get it back." The defendant and Geraldine became convinced that the money would not be returned. The defendant then said he himself would kill Donald Burke. James Hope had previously told Geraldine that he would prefer to commit the murder, because the defendant was likely to "mess it up." Hope had said that he could kill a man with one blow and "nobody will know."

The group left Hope's house and drove to a bar for some drinks. There the defendant indicated that Donald Burke should be killed that night. Geraldine returned to her home, as the defendant directed. She arranged for all of her children and those of her husband to be away from the house that evening. She received a telephone call from the defendant instructing her to obtain her husband's gun and to bring it to a parking lot near the bar where he and Hope had remained.

After her husband was asleep, Geraldine obtained his gun and, with her sister-in-law, Carroll Pate, drove to the parking lot. There she met the defendant and Hope. The defendant took possession of the gun. By the time Geraldine returned to her home, the defendant and Hope were already there. At Hope's request, she went into the bedroom to see whether her husband was awake. She found him still asleep. She then went to the living room, where Carroll Pate was waiting. Hope entered the bedroom and struck the victim several times. The defendant also entered the bedroom and

fired several shots into the victim's body. His death was caused by those gunshot wounds.

In claiming there was insufficient evidence to support his conviction of capital felony murder, the defendant challenges none of the facts we have recited. He contends, nevertheless, that these facts do not reasonably support the trial court's conclusion that the killing of the victim constituted a "murder committed by a defendant who is hired to commit the same for pecuniary gain," as required by General Statutes § 53a-54b (2) for the crime of capital felony murder. The defendant focuses upon the definition of the word "hired" as implying a relationship wherein one person engages the services of another who, for compensation, agrees to perform specified services. Webster's Third New International Dictionary; The Oxford English Dictionary (1961); see *Groton* v. *Commission on Human Rights & Opportunities,* 169 Conn. 89, 108, 362 A.2d 1359 (1975) (*Cotter, J.,* concurring). He refers to the testimony of Geraldine Burke that she had never hired him and of Tammy Pate that her mother had not given the money "for John to kill." He maintains that his relationship with Geraldine in the killing of Donald Burke does not satisfy this definition of "hired" because the evidence was insufficient to prove (1) that the defendant accepted the $3500 from Geraldine with the understanding that *he* would kill her husband in exchange therefor, and (2) that Geraldine gave him the money with that understanding.

The trial court found that the arrangement made at the time the defendant received the $3500 from Geraldine was that he would pay this sum to Rooney, who would accomplish the murder of the victim. The trial court also found that the defendant did not commit the murder "solely as consideration for the receipt or retention of anything of pecuniary value," such as the $500 he had secretly kept for his own use from the

sum given him by Geraldine, but was also "motivated by other considerations in the nature of a warped sense of love, affection and/or duty or obligation." The court concluded, nevertheless, that after his attempt to hire Rooney in behalf of Geraldine Burke had failed, the defendant "became the hired person who actively participated, aided, and/or abetted in the events which proximately caused the death of Donald Burke."

The adoption in 1973[4] of General Statutes § 53a-54b reintroduced the death penalty in this state for certain specified offenses, presumably in accordance with the guidelines suggested in *Furman* v. *Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346, reh. denied, 409 U.S. 902, 34 L. Ed. 2d 164, 93 S. Ct. 89 (1972), a decision which had effectually invalidated our previous death penalty statutes as violative of the federal constitution. The extensive legislative history attending the enactment of this "capital felony" statute contains few references specifically relating to subsection (2) of the statute, "murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain." During the debate in the Senate this provision was described as pertaining to "the hired assassin, the hired gunman." In the House debate "murder by a kidnapper of a kidnapped person" was equated in culpability with "murder for hire."[5]

---

[4] Public Acts 1973, No. 73-137, § 3.

[5] During the debate in the House of Representatives on the adoption of Public Acts 1973, No. 73-137, Representative James F. Bingham, in defending subsection (5), "murder by a kidnapper of a kidnapped person during the course of the kidnapping or before such person is able to return or be returned to safety," remarked: "Murder by a kidnapper of a kidnapped person is the same as murder for hire." 16 H.R. Proc., Pt. 6, 1973 Sess., p. 2964.

During the Senate debate, Senator George C. Guidera referred to subsection (2) as providing for "the hired assassin, the hired gunman." 16 S. Proc., Pt. 4, 1973 Sess., p. 1868.

We must reject the defendant's challenge to the finding of the trial court that he was partially motivated by his desire for "pecuniary gain" to become involved in the events leading to the murder of Donald Burke and in ultimately assuming the role of killer. This finding is adequately supported by the evidence of the surreptitious retention of $500 of the $3500 he received from Geraldine and by his failure to return the sum he had kept when efforts were made to have Rooney give back the $3000 paid to him. Though Geraldine might never have discovered the defendant's deception even if her husband had remained alive, the defendant may have feared she might contact Rooney directly in seeking the return of her money and thus discover his fraud. He may have thought she was less likely to approach Rooney once her husband had been murdered. The evidence lends reasonable support to these inferences as a basis for finding the defendant to have been partially motivated by a desire for pecuniary gain. The court was not obligated to conclude from the evidence, as the defendant contends, that he was motivated *solely* by other considerations, such as his concern for Geraldine and her family. Though the defendant's financial motivation for becoming involved in the transaction is thus adequately established, the statutory requirement of a *hiring* for pecuniary gain must also be satisfied.

It is undisputed that Geraldine Burke did not originally contemplate that the defendant himself would kill her husband. She did, prior to commission of the crime, however, agree to his assumption of the role of murderer and accept his performance of the obligation that she believed Rooney owed her. Even under the original arrangement, performance by Rooney in person was not bargained for, because Geraldine had been told that Rooney would either "do the job or see that it was done." If Rooney, as Geraldine assumed, had received the entire $3500 she delivered to the defendant, and

had then paid the defendant or some other person $500 to kill the victim, we agree with the state that it would be nonsensical to argue that the killer had not been hired to commit the murder for pecuniary gain simply because Geraldine was unaware of his identity. There is, however, no evidence of this hypothetical scenario.

Although Geraldine was aware that the defendant was taking an active part in the murder, she was unaware of his fraudulent retention of some of the money she had given him to hire Rooney. She had no reason to believe that the defendant was partially motivated by pecuniary gain and she must have assumed that he was carrying out the murder because of his friendship with her and his embarrassment over the financial loss she had sustained as a result of his recommendation of Rooney. The circumstances known to her concerning the defendant's motivation and relationship to the murder would not have led a reasonable person in her situation to believe that she had *hired* the defendant to commit the murder and had thus violated the provisions of § 53a-54b (2) that imposes liability for a capital felony on the hirer as well as the person hired.[6]

The defendant similarly cannot reasonably be charged with the realization that he had been *hired* by Geraldine to commit the murder. Though the trial court could reasonably have found he was partially motivated by his desire to retain the money he had obtained by deceiving Geraldine, those circumstances do not establish a *hiring* relationship because the essential element of an agreement to compensate the defendant for his services is absent. His motive to avoid having to return

---

[6] General Statutes § 53a-54b (2) defines a capital felony both as "murder committed by a defendant who is hired to commit the same for pecuniary gain" and a "murder committed by one who is hired by the defendant to commit the same for pecuniary gain." Geraldine Burke was not convicted under this provision but was convicted on a plea of nolo contendere of murder and conspiracy to commit murder.

the money he had fraudulently obtained cannot be regarded as legally sufficient to constitute an *agreement* for compensation. Geraldine had no knowledge of this aspect of his motivation and therefore could not have agreed to such compensation. From the viewpoint of the defendant also, his desire to conceal his fraud and thus achieve a pecuniary gain could not have induced in a reasonable person a realization that he was committing a murder for compensation.

A construction of the statute that treats the defendant as hired simply because he assumed the responsibility of fulfilling an obligation of the person he had recommended and because he would gain financially by doing so is not readily apparent or reasonably foreseeable. "When a[n] . . . unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." *Bouie* v. *Columbia,* 378 U.S. 347, 354–55, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964); see *Douglas* v. *Buder,* 412 U.S. 430, 432, 93 S. Ct. 2199, 37 L. Ed. 2d 52 (1973). Criminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. See *Rewis* v. *United States,* 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971); *Bell* v. *United States,* 349 U.S. 81, 83, 75 S. Ct. 620, 99 L. Ed. 905 (1955); *State* v. *Rawls,* 198 Conn. 111, 121, 502 A.2d 374 (1985); *State* v. *Dupree,* 196 Conn. 655, 660, 495 A.2d 691 (1985). These considerations are especially pertinent to a death penalty statute such as § 53a-54b. The trial court overlooked these principles in concluding that the defendant, upon the failure of his attempt to hire Rooney to commit the murder, "became the hired person" and thus had committed a capital felony.

In deciding whether a person has been hired to commit a murder for pecuniary gain we are concerned principally with adopting a construction of subsection (2) of § 53a-54b that effectuates the legislative intention, not with the technical niceties of contract law. We conclude that the circumstances of the defendant's involvement in the murder of Donald Burke do not bring him within the category of "hired assassin" that the legislature sought to punish for the offense of capital felony. The trial court erred in finding him guilty of that crime.

Our conclusion that the judgment of the trial court was erroneous in convicting the defendant of a capital felony does not require a remand for a new trial. Murder in violation of General Statutes § 53a-54a[7] is a lesser included offense of a capital felony in violation of § 53a-54b (2) as charged in the indictment. As thus charged, the defendant could not have committed "murder for hire" without also committing intentional murder in violation of § 53a-54a. The failure of the state to prove the additional element of a hiring to commit the murder leaves standing the finding of the court that

---

[7] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

the defendant did murder Donald Burke. The case must be remanded to modify the judgment and to resentence the defendant accordingly.

There is error in part, and the case is remanded to the trial court with direction to modify the judgment to reflect a conviction of murder in violation of § 53a-54a and for further proceedings in regard to sentencing.

In this opinion the other judges concurred.