570

STATE OF CONNECTICUT *v.* JAMES Y. HOPE
(13720)

PETERS, C. J., SHEA, GLASS, COVELLO and HULL, Js.

Argued May 4—decision released July 10, 1990

*Hubert J. Santos,* for the appellant (defendant).

*C. Robert Satti, Sr.,* state's attorney, for the appellee (state).

GLASS, J. The dispositive issue in this appeal is whether the state is barred by the double jeopardy clause from prosecuting the defendant for aiding and abetting murder after the defendant had been acquitted of conspiracy to commit capital felony murder and

the lesser included offense of conspiracy to commit murder. Because an understanding of the facts of this case is necessary to examine its procedural history, we shall summarize the relevant evidence presented at the defendant's first trial, prior to detailing the procedural history of the case.

Geraldine Burke wanted to have her third husband, Donald Burke, to whom she had been married for two years, killed because of his alleged maltreatment of her. In furtherance of this plan, Geraldine Burke asked her daughter, Tammy Pate, to find someone to commit the murder. In June, 1981, Tammy Pate began to date John McGann, and subsequently introduced McGann to her mother. In July, 1981, Geraldine Burke asked McGann whether he knew anyone whom she could pay to kill her husband. A few days later, McGann told Geraldine Burke that he had found someone to commit the murder and that it would cost $4000. Geraldine Burke then borrowed $3500 from a neighbor, which she gave to McGann with the understanding that McGann would advance the balance of $500 himself to make $4000.

McGann had spoken previously to an individual named George Rooney, an auto mechanic in Groton, in regard to having someone eliminated. After four or five meetings, Rooney told McGann that the job could be done by someone in Rhode Island for $3000. In July, 1981, McGann gave Rooney $1500 in cash saying he would return a few days later with the balance of $1500. At that time, McGann also gave Rooney a photograph of Donald Burke that had Burke's vehicle registration number and the type of vehicle that he drove written on the back. Two or three days later, McGann saw Rooney again and paid him the outstanding $1500. After paying Rooney, McGann had a number of bills left over, which he put back in his pocket. Rooney then told McGann that the job would take two or three weeks to complete.

On July 20, 1981, shortly after Geraldine Burke had given McGann the $3500, she entered the hospital for treatment of an ulcer. It had been planned that Donald Burke would be murdered while she was in the hospital. Towards the end of her stay, however, McGann told her that it looked as though Rooney might not have Donald Burke killed and, if that were the case, he would do the job himself. Upon leaving the hospital on August 6, 1981, Geraldine Burke went with Tammy Pate to a picnic at a friend's house on Niantic River Road in Waterford. McGann and the defendant attended the picnic as well. Throughout June and July, 1981, McGann, a friend of the defendant, had told him of the situation at the Burke house and the plot to kill Donald Burke. While at the picnic, Geraldine Burke claimed that the defendant told her that he would rather kill Donald Burke himself because McGann would "screw it up" and because he (the defendant) could "kill [Donald Burke] with just one blow" as a result of his knowing some type of karate.

Later that day, McGann and Geraldine Burke left the picnic and walked across the street to the defendant's house to use the phone. Tammy Pate and the defendant also walked over to the defendant's house and arrived there just as McGann was getting off of the phone. McGann said that he did not think he could get the money back from Rooney, and added that, if he did not get the money back, he would do the job himself. That night, McGann mentioned to the defendant drugging, strangling or shooting Donald Burke.

On August 8, 1981, at approximately 2:30 p.m., Geraldine Burke and Tammy Pate picked up McGann at his house and drove to Danny's Cafe, a bar in Niantic. McGann said to Geraldine Burke that "[t]onight's the night," and a discussion was held about drugging Donald Burke with valium in order to kill him. Later, they returned to the Burke house where Geraldine

Burke filled a capsule with four crushed tablets of valium with the intention of giving the capsule to Donald Burke. Tammy Pate then gave McGann a ride home. Donald Burke returned home from work around 5 or 5:30 p.m. and Tammy Pate gave him a large glass of wine and he soon fell asleep. At about 6 or 6:30 p.m., the defendant picked up McGann and went to Danny's Cafe. At about 10 p.m., Tammy Pate joined McGann, the defendant and John Pate, Jr., Geraldine Burke's son, at Danny's Cafe.

McGann asked Tammy Pate to phone her mother from Danny's Cafe. Geraldine Burke told Tammy Pate on the phone that Donald Burke had fallen asleep, and Tammy Pate then handed the phone to McGann. As a result of her telephone conversation with McGann, Geraldine Burke took her husband's .22 caliber pistol from his truck, put it in the back seat of her car, and drove to the parking lot of Mitchell's Grocery Store with her ex-sister-in-law, Carrol Pate. While inside Danny's Cafe, McGann told the defendant that he was going to kill Donald Burke and asked if he would help move the body. The defendant, McGann and John Pate, Jr., then went outside Danny's Cafe, where, according to John Pate, Jr., the defendant told him that he and McGann were going to his house to kill his step-father, Donald Burke. McGann, the defendant and John Pate, Jr., then walked over to the parking lot of Mitchell's Grocery Store to meet Geraldine Burke, where, according to Geraldine Burke, the defendant said to her: "I told your son I'm going to kill . . . your husband tonight. . . . He has the right to know." McGann then got the pistol out of Geraldine Burke's car and was driven by the defendant to the Burke house.

Geraldine Burke left the parking lot with Carrol Pate, stopped at a Burger King, and met the defendant and McGann back at her house. The defendant was waiting at the back door and entered the house with Ger-

aldine Burke and Carrol Pate. According to Geraldine Burke, the following sequence of events then transpired. The defendant asked which room was Donald Burke's, and Geraldine Burke said that it was down the hall. The defendant led Geraldine Burke down the hall and told her to go into the bedroom to see if Donald Burke was asleep. The defendant then told Geraldine Burke to get into the living room, and as she walked away she heard blows being struck in the bedroom. At that time, McGann went into Donald Burke's bedroom and a shot was fired. McGann then left the bedroom to unjam the pistol, and Geraldine Burke once again heard the sound of blows being struck in the bedroom. McGann returned to the bedroom, and Geraldine Burke heard more shots and blows. Finally, Geraldine Burke heard McGann say "[s]top hitting him; he's dead," and the defendant say "[h]e died hard, didn't he?" The defendant then ordered Geraldine Burke to get something to cover Donald Burke's body, and she returned with an afghan and a plastic bag. The defendant and McGann put Donald Burke's body into the plastic bag, covered it with the afghan, and dragged it outside and put it into Donald Burke's truck. The defendant and McGann then proceeded to remove other incriminating evidence from the house.

The defendant, however, testified that he never told Geraldine Burke that he could or would kill Donald Burke, and that he never told John Pate, Jr., that he was going to kill Donald Burke, but rather told him only that Geraldine Burke and McGann were going to kill Donald Burke. In addition, the defendant testified that, although he went to the Burke residence knowing of the plan by McGann and Geraldine Burke to kill Donald Burke, he had no intention of committing murder. Instead, he claimed that he had actually offered Geraldine Burke money to forget her plan to have Donald Burke killed, and that he drove McGann to the Burke

house in the hope of persuading him and the others not to kill Donald Burke. Thus, while the defendant admitted to being present at the Burke house when Donald Burke was killed, he denied beating Donald Burke or even being present in the room when Donald Burke was killed. Rather, he claimed that he was sitting at the kitchen table with Carrol Pate when he heard shots being fired. In sum, the defendant denied "that he assisted McGann in the killing of [Donald] Burke or directly participated in the killing or engaged in concerted action with McGann and [Geraldine] Burke to commit murder." Moreover, the defendant explained his actions of moving Donald Burke's body and of secreting evidence after the murder as ones of fear and panic.

To buttress further its theory that the defendant was a direct participant in the murder, the state called Henry Lee, chief of the Connecticut state police forensic crime laboratory. Lee testified that certain blood splatter patterns found on the back of the defendant's blue jeans indicated that he was in close proximity to the body at the time of the murder. The defense countered Lee's testimony with its own blood splatter expert's testimony that the patterns indicated that the defendant was not near the body at the time of the killing. The state also called Catherine Galvin, then Connecticut's chief medical examiner, who testified that bruises and contusions found on Donald Burke's face were consistent with his being beaten before being murdered. The defense, however, countered this testimony with testimony from its own pathologist, who testified that the injuries to Donald Burke's face were the result of gunshot wounds to the head. In addition, the defendant testified that he was intoxicated on the night of Donald Burke's murder.

The jury was presented with all of this evidence as a result of proceedings that began on October 13, 1981,

when the state filed a two count indictment charging the defendant with the crimes of conspiracy to commit capital felony murder in violation of General Statutes §§ 53a-48 (a) and 53a-54b (2)[1] and capital felony murder in violation of General Statutes §§ 53a-54b (2) and 53a-8.[2] On October 19, 1981, the defendant moved to dismiss both counts, claiming, inter alia, that the capital felony count was defective "for the reason that one cannot be guilty of capital felony murder on the basis of aiding and abetting capital felony murder."

On December 21, 1981, the defendant filed his second motion to dismiss. Specifically, he argued that the conspiracy count, count one, failed to allege an overt act. In addition, he contended that count two, the capital felony count, was also defective. In particular, he noted: (1) that § 53a-54b (2) requires that a person commit the crime of murder after being hired to do so for pecuniary gain; (2) that count two alleged that his codefendant, Geraldine Burke, hired John McGann, but that the murder was committed by Hope; and (3) that the count failed to allege that Geraldine Burke had hired him. Consequently, the defendant argued that the count failed to allege the offense of capital felony mur-

---

[1] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

"[General Statutes] Sec. 53a-54b. CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following . . . (2) murder committed by a defendant who is hired to commit the same for pecuniary gain or murder committed by one who is hired by the defendant to commit the same for pecuniary gain . . . ."

[2] "[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

der in violation of § 53a-54b (2). The trial court rejected the defendant's claim as to count two, but dismissed count one, charging conspiracy, because of its failure to allege an overt act.

On July 15, 1982, however, the grand jury returned a new conspiracy indictment, alleging the following: "In furtherance of the conspiracy and to effect the objects thereof, one or more of the following overt acts were committed:

"1. In July, 1981, the exact date being to the Grand Jury unknown, Geraldine Burke borrowed three thousand five hundred ($3,500) dollars from a neighbor to pay for the murder of Donald C. Burke.

"2. Several days thereafter, the exact date being to the Grand Jury unknown, Geraldine Burke gave the money to John McGann.

"3. Near the end of July or early August, 1981, the exact date being to the Grand Jury unknown, James Y. Hope told Geraldine Burke how he would kill the victim, Donald Burke.

"4. On August 8, 1981, at the directions of John McGann, Geraldine Burke got the victim, Donald Burke's, handgun from Donald Burke's truck.

"5. On August 8, 1981, in the night hours or the early morning of August 9, 1981, Geraldine Burke, James Y. Hope and John McGann met in downtown Niantic and John McGann got Donald C. Burke's handgun from Geraldine Burke and the three parties arranged to meet at the Burke residence in the early hours of August 9, 1981.

"6. In the early morning hours of August 9, 1981, Geraldine Burke, James Y. Hope and John McGann entered the Burke residence, and the said Donald C. Burke was murdered by one or more of said persons,

Geraldine Burke, James Y. Hope or John McGann, who with intent to cause his death, caused the death of said Donald C. Burke.''

The jury selection process commenced on May 3, 1983, and lasted for approximately five weeks. During that time period, defense counsel advised the court that he believed that both counts of the indictment were defective. In an attempt to resolve the ongoing dispute, the state filed, on June 1, 1983, a motion captioned: ''Motion for Judicial Determination of Applicability of Section 53a-54b (2) in View of Offer of Proof by the State of Connecticut.'' The motion sought a ruling from the court as to the culpability of a defendant for capital felony murder in violation of § 53a-54b (2) when that defendant was not hired to commit the murder, but acted as an accessory or coprincipal to the murder. The state conceded in its motion that it had no evidence that the defendant was hired to kill Donald Burke or that he hired anyone to do so. This was the precise issue the defendant had raised in his second motion to dismiss dated December 21, 1981. The trial court, however, took no action regarding the capital felony count at that time.

After the jury had been sworn, on June 29, 1983, the defendant filed his third motion to dismiss the capital felony count and raised again the issue that he had raised in his pretrial motions to dismiss, to wit: That the capital felony count failed to allege that the defendant was hired to kill Donald Burke and that there was no allegation that the alleged hiree, John McGann, murdered Donald Burke. After receiving briefs from the parties, the trial court dismissed the capital felony count with prejudice on July 19, 1983, and advised the parties that a detailed memorandum explaining the basis of its decision would be filed at a later date. The defendant's trial proceeded as to the first count, however, and on August 9, 1983, the jury acquitted him of conspiracy

to commit capital felony murder and the lesser included offense of conspiracy to commit murder. The trial court then filed its memorandum of decision on August 19, 1983, dismissing, with prejudice, the capital felony count, as well as the lesser included murder count. The state sought and was granted permission to appeal the dismissal of the capital felony count, but before the state's appeal was heard this court decided *State v. McGann,* 199 Conn. 163, 506 A.2d 109 (1986). As a result of the court's decision in *McGann,* the state's appeal was dismissed as moot. See *State v. Hope,* 203 Conn. 420, 524 A.2d 1148 (1987).[3]

On June 1, 1987, the state filed a substitute information charging the defendant with the crime of murder in violation of General Statutes §§ 53a-54a[4] and 53a-8. Specifically, the state charged that the defendant "while acting in concert with Geraldine Burke and John McGann did, with intent to cause the death of another person, Donald C. Burke, cause the death of said Donald C. Burke." On November 24, 1987, the

[3] In *State v. McGann,* 199 Conn. 163, 506 A.2d 109 (1986), this court held that McGann, who was alleged to have committed the crime of capital felony murder as a principal, could not be convicted of that crime. Thus, in *State v. Hope,* 203 Conn. 420, 524 A.2d 1148 (1987), this court ruled that the defendant could no longer be tried as an accessory to that capital felony murder, and dismissed the state's appeal as moot.

[4] General Statutes (Rev. to 1981) § 53a-54a, as amended by Public Acts 1980, No. 80-442, §§ 15, 28, provides in part: "MURDER DEFINED. AFFIRM-ATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

defendant moved to dismiss the information on double jeopardy and collateral estoppel grounds and for the additional reason that the murder count had been dismissed with prejudice on July 19, 1983. In response, on April 19, 1988, the state filed an amended substitute information, that again charged the defendant with murder in violation of §§ 53a-54a and 53a-8, but this time alleged: "JAMES Y. HOPE at Waterford, Connecticut, with intent that the death of another person, Donald C. Burke, be caused, intentionally aided Geraldine Burke and John McGann in the causing of the death of said Donald C. Burke." On May 2, 1989, the trial court denied the defendant's motion to dismiss, and the defendant then filed this appeal.

On appeal, the defendant argues that the trial court should have granted his motion to dismiss: (1) because aiding and abetting murder and conspiracy to commit murder are the same offense for double jeopardy purposes; (2) because his prosecution for aiding and abetting murder is barred by principles of collateral estoppel as embodied in the double jeopardy clause; and (3) because the murder count against him had previously been dismissed with prejudice. We agree with the defendant's contention that the trial court should have granted his motion to dismiss because his prosecution for aiding and abetting murder is barred by principles of collateral estoppel as embodied in the double jeopardy clause.[5]

I

The state maintains that the defendant is barred from asserting a claim of collateral estoppel because he did

---

[5] Recently, in *Grady* v. *Corbin*,      U.S.     , 110 S. Ct. 2084, 109 L. Ed. 2d 548 (1990), the United States Supreme Court held that double jeopardy precludes a subsequent prosecution with regard to the same underlying conduct for which a defendant has already been prosecuted. Since the state cannot prevail even under the more restrictive view of collateral estoppel and double jeopardy that predated *Grady,* this avenue of inquiry need not be pursued in this case.

not move to dismiss the second count of the indictment until after the jury was sworn. See *Lee* v. *United States,* 432 U.S. 23, 31–34, 97 S. Ct. 2141, 53 L. Ed. 2d 80 (1977); *United States* v. *Dinitz,* 424 U.S. 600, 607, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976). The crux of the state's argument is that the defendant's motion to dismiss on June 29, 1983, after the jury had been sworn, was not based on the same grounds as the defendant's earlier motions to dismiss that were filed prior to trial. We are not persuaded by the state's contention.

Specifically, in his first motion to dismiss, dated October 19, 1981, the defendant argued: "7. As to the Second Count, for the reason that one cannot be guilty of capital felony murder on the basis of aiding and abetting capital felony murder." In his second motion to dismiss, dated December 21, 1981, the defendant argued: "3. As to count two for the reason that by its language Section 53a-54b requires that a person commit as a principal (and not as an aider or abetter) one of the eight substantive crimes listed. Specifically, Section 53a-54b (2) requires that the defendant commit murder after being hired to commit same for pecuniary gain. Count two alleges that co-defendant Burke hired co-defendant McGann to commit murder and that the actual murder was committed by 'a person or persons, including James Y. Hope.' There is no allegation that Burke hired Hope. Consequently, the count fails to allege the offense of capital felony murder." Finally, in his third motion to dismiss, dated June 29, 1983, the defendant asserted: "1. Count two alleges a violation of Connecticut Gen. Stat. § 53a-54b (2), capital felony murder. The indictment alleges that Geraldine Burke hired John McGann for his pecuniary gain, for the purpose of causing the death of her husband, Donald C. Burke. The indictment fails to allege, however, that John McGann murdered Donald C. Burke. Section 53a-54b (2) requires that the 'hiree' commit the

murder. The indictment alleges that Donald C. Burke 'was murdered by a person or persons, including said James Y. Hope. . . .'

"The Defendant, of course, has taken the position that the person hired must be 'a defendant,' i.e. James Y. Hope, (see paragraph 3), a position rejected by the [trial] Court.

"2. Section 53a-54b (2) requires that the person hired be a 'defendant.' This is an essential element of the crime. The indictment fails to allege that McGann is 'a defendant.'

"3. By use of the phrase 'a defendant' Section 53a-54b (2) requires that the person hired be the defendant on trial, i.e. James Y. Hope. The indictment fails to allege this element of the crime. Instead, it alleges that Geraldine Burke hired John McGann."

Thus, the defendant's position was consistent throughout. He argued that count two of the indictment did not allege that the murder was committed by the hiree. In short, the defendant contended prior to trial that the state had failed to allege the proper nexus between the hiree and the murder. Moreover, in its memorandum of decision on the defendant's motion to dismiss count two, the trial court wrote: "An essential element of the crime of capital felony murder under Section 53a-54b (2) *is that the person who commits the murder be the one hired to commit it.* In the present case, the second count of the indictment alleges that 'Geraldine Burke hired John McGann for his pecuniary gain, for the purpose of causing the death of . . . Donald C. Burke, and . . . the said Donald C. Burke was murdered by a person or persons including said JAMES Y. HOPE.' *The indictment alleges no connection between the allegation that John McGann was hired for pecuniary gain to cause the death of the victim and the allegation that the defendant murdered the victim.*

"An allegation which links pecuniary gain to the murder is required in an indictment under section [53a-54b (2)]. It must be alleged that John McGann, the hiree for pecuniary gain, actually participated in the murder or, at a minimum, *that the person or persons who committed the murder did so as John McGann's agents.* Because of the absence of any allegation as to this essential element of the crime of capital felony murder, the second count of the indictment is defective." (Emphasis added.)

The state's argument therefore fails because the defendant did not wait to move to dismiss the second count of the indictment until after the jury had been sworn. Rather, the record fully sustains the defendant's position that he had moved twice prior to trial to have the second count dismissed because the indictment failed to allege a proper nexus between the hiree and the murder.[6]

---

[6] In *Lee* v. *United States*, 432 U.S. 23, 97 S. Ct. 2141, 52 L. Ed. 2d 80 (1977), the government's information was dismissed because of its failure to provide adequate notice of the crime charged. The defendant was then retried and convicted of the same crime. The United States Supreme Court then rejected the defendant's double jeopardy claim on the grounds: (1) that the dismissal was not a judgment on the merits; and (2) that the trial court was forced by the defendant's late filing of the motion to rule upon it after jeopardy had attached. Justice Brennan, however, wrote in his concurring opinion: "I emphasize, however, that an entirely different case would be presented if the petitioner had afforded the trial judge ample opportunity to rule on his motion prior to trial, and the court, in failing to take advantage of this opportunity, permitted the attachment of jeopardy before ordering the dismissal of the information. In such a circumstance, the court's action or inaction would effectively deprive petitioner of his 'valued right' to receive a factual determination from the first empaneled factfinder and would subject a defendant to the 'embarrassment, expense and ordeal' of a needless trial[.] *Green* v. *United States*, 355 U.S. 184, 187 [78 S. Ct. 221, 2 L. Ed. 2d 199 (1957)]. Even if the defendant renews his motion at trial, it would not be accurate in such a situation to argue that the defense has made the choice to forgo the right of presenting its case to the first factfinder in order to attain a beneficial legal ruling. *United States* v. *Dinitz*, 424 U.S. 600 [96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976)]; *United States* v. *Jorn*, [400 U.S. 470, 485, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971)]. On the

## II

Having concluded that the defendant is not barred from asserting a claim of collateral estoppel, we shall examine his claim on the merits. In a criminal case, collateral estoppel is a protection included in the fifth amendment guarantee against double jeopardy. *Ashe* v. *Swenson,* 397 U.S. 436, 445, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970). " 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id., 443. "Collateral estoppel applies in two ways: (1) it may bar prosecution or argumentation of facts necessarily established in a prior proceeding; or (2) it may completely bar subsequent prosecution where one of the facts necessarily determined in the former trial is an essential element of the conviction the government seeks. *United States* v. *Griggs,* 735 F.2d 1318 (11th Cir. 1984)." *United States* v. *DeMarco,* 791 F.2d 833, 836 (11th Cir. 1986).

To establish whether collateral estoppel applies, the court must determine what facts were necessarily determined in the first trial, and must then assess whether the government is attempting to relitigate those facts in the second proceeding. *De La Rosa* v. *Lynaugh,* 817 F.2d 259, 263 (5th Cir. 1987); *United States* v. *Irvin,* 787 F.2d 1506, 1515 (11th Cir. 1986).

---

contrary, the defendant placed in this predicament by the trial judge would have done everything in his power to receive a fair adjudication of his legal claims without compromising his right to proceed with the first factfinder. Honoring his double jeopardy claim thus not only is in keeping with the policies and interests served by the Clause, but also would further the cause of efficient judicial administration by encouraging defendants to present, and judges to rule, on legal claims prior to the clamor and heat of trial." Id., 35–36 (Brennan, J., concurring).

"A defendant who argues that *Ashe* is applicable to his case carries the burden of establishing that the issue he seeks to foreclose from consideration in the second case was 'necessarily' resolved in his favor in the prior proceeding. *United States* v. *Seijo,* 537 F.2d 694, 697 (2d Cir. 1976), cert. denied, 429 U.S. 1043, 97 S. Ct. 745, 50 L. Ed. 2d 756 (1977)." *United States* v. *Castro,* 629 F.2d 456, 465 (7th Cir. 1980). Furthermore, when a defendant is acquitted of conspiracy and then retried on the substantive offense, "if it can be determined that the first jury must have determined an ultimate fact common to the conspiracy and substantive crimes in the defendant's favor, acquittal of conspiracy may prevent the government from introducing the evidence necessary to convict the defendant of the substantive offense in a subsequent trial." *United States* v. *Bollinger,* 796 F.2d 1394, 1406 (11th Cir. 1986).

"The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' *Sealfon* v. *United States,* 332 U.S. 575, 579 [68 S. Ct. 237, 98 L. Ed. 180 (1948)]. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Ashe* v. *Swenson,* supra, 444.

"Moreover, in reviewing the earlier trial to determine the jury's basis for the acquittal, a court 'should not strain to dream up hypertechnical and unrealistic grounds on which the previous verdict might conceivably have rested.' *United States* v. *Jacobson,* 547 F.2d 21, 23 (2d Cir. 1976), cert. denied, 430 U.S. 946, 97 S. Ct. 1581, 51 L. Ed. 2d 793 (1977). See also *United States* v. *Mespoulede,* [597 F.2d 329, 333 (2d Cir. 1979)]. ' "[U]nrealistic and artificial speculation about some far-fetched theory upon which the jury might have based its verdict of acquittal" is foreclosed.' *State* v. *Edwards,* 310 N.C. 142, 145, 310 S.E.2d 610, 613 (1984), quoting *United States* v. *Sousley,* 453 F. Supp. 754, 762 (W.D. Mo. 1978)." *Ferrell* v. *State,* 318 Md. 235, 245–46, 567 A.2d 937 (1990); see *United States* v. *Mespoulede,* supra. Limited ambiguity that exists in a jury's verdict should be "resolved, in accordance with the protections of the Double Jeopardy Clause, in favor of the defendant." *United States* v. *Hans,* 548 F. Sup. 1119, 1126 (S.D. Ohio 1982).

In the present case, at the defendant's trial for conspiracy to commit capital felony, for which he was acquitted, the state had the burden of proving beyond a reasonable doubt the following: (1) that the defendant intended that Donald Burke be murdered; (2) that the defendant agreed with John McGann and/or Geraldine Burke to "engage in or cause the performance" of the murder; and (3) that the defendant, McGann and/or Geraldine Burke committed an overt act in furtherance of the conspiracy to murder Donald Burke. In the state's proposed second trial for aiding and abetting murder, the state will have to prove beyond a reasonable doubt the following: (1) that the defendant intended that Donald Burke be murdered;[7] and (2) that

---

[7] "Whether a person who is present at the commission of a crime aids or abets its commission so as to be criminally liable depends on the circumstances surrounding his presence there and his conduct while there. ' "The

the defendant "intentionally aided" McGann and/or Geraldine Burke in the murder of Donald Burke.

The defendant maintains that in acquitting him of conspiracy to commit capital felony murder, and the lesser included offense of conspiracy to commit murder, the jury necessarily determined that he lacked the intent that Donald Burke be murdered. The defendant thus argues that, since that same element of intent is necessary for him to be found guilty of aiding and abetting Donald Burke's murder, the state is collaterally estopped from bringing the second prosecution for aiding and abetting murder.

Therefore, the seminal question that we must resolve is whether, in the defendant's trial for conspiracy to commit capital felony murder, the jury could have acquitted the defendant, yet still, rationally and reasonably, have found that the defendant possessed the specific intent that Donald Burke be murdered. In other words, if the jury could have rationally and reasonably concluded that the state did not meet its burden of proving an agreement, but did meet its burden regarding the defendant's intent, then the defendant's collateral estoppel claim must fail.[8] If, however, the jury could not have acquitted the defendant without necessarily

accessory statute, [General Statutes] § 53a-8, sets forth the element of intent as a twofold requirement: that the accessory have the intent to aid the principal and that in so aiding he intend to commit the offense with which he is charged. See LaFave & Scott, Criminal Law (1972), p. 505 n.53, § 64." . . . *State* v. *Harrison,* [178 Conn. 689, 694, 425 A.2d 111 (1979)].' *State* v. *Haddad,* [189 Conn. 383, 399, 456 A.2d 316 (1983)]. 'A person acts "intentionally" with respect to a result or conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct.' . . . Intent is a mental process, and absent an outright declaration of intent, must be proved through inferences drawn from the actions of an individual . . . ." (Emphasis omitted.) *State* v. *Crump,* 201 Conn. 489, 495, 518 A.2d 378 (1986).

[8] The state does not argue that the jury could have rationally and reasonably concluded that no overt act in furtherance of the conspiracy was committed.

determining that he lacked the specific intent that Donald Burke be murdered, then the defendant must prevail on his claim of collateral estoppel.

We conclude that the jury necessarily determined that the defendant lacked the specific intent that Donald Burke be murdered. For the jury to have acquitted the defendant, one of the following scenarios must have taken place. The jury might have believed the defendant's version of what transpired on the night of Donald Burke's murder, i.e., that he went to the Burke house with the intent of preventing the murder, that he did not beat Donald Burke and that he was not in the bedroom when Donald Burke was killed. If this were so, then logically the jury necessarily determined that the defendant lacked the intent that Donald Burke be murdered. Also, given that the jury received an instruction on the effect of intoxication on a defendant's intent, the jury might have concluded that the defendant lacked the intent to kill Donald Burke as a result of his intoxication.[9] Finally, the state argues that the jury could simply have found that there was no agreement between the defendant, McGann and/or Geraldine Burke. If the jury believed the state's version of the case, however, we cannot conceive of how the jury could have rationally and reasonably concluded that the defendant had the intent that Donald Burke be murdered, but did not "agree" with McGann "to engage in or cause the performance" of the murder.

---

[9] The trial judge charged the jury on intoxication in the following manner: "Now, under the law of this state, a person may be so intoxicated from the voluntary consumption of alcoholic beverages that he may lack the specific intent to commit the crime charged. Intoxication is defined under the statutes as 'a substantial disturbance of mental or physical capacities resulting from introduction of substance into the body.' . . . If, therefore, you have a reasonable doubt that the defendant possessed the specific intent required because of his intoxicated condition, you must find him not guilty of the charge of conspiracy to commit capital felony murder."

Specifically, the jury received the following instruction on "agreement": "For . . . persons to be guilty of the crime of conspiracy, it is not necessary that there should be a formal agreement among them. It need not be in any expressed form. It is not necessary for the State to prove that there was a formal or expressed agreement alone. It is sufficient if there is a meeting of the minds; that is, if the parties understand one another, whether they express themselves in so many words or not." Thus, it is difficult to fathom how the jury could have rationally and reasonably concluded that the defendant did not agree with McGann "to engage in or cause the performance" of Donald Burke's murder, yet still believed that the defendant drove McGann to the Burke house, walked into Donald Burke's bedroom, began to beat Donald Burke, stopped beating Donald Burke while McGann shot him, and then started beating Donald Burke again until McGann told him to stop because Donald Burke was dead.

In sum, we conclude that the jury necessarily determined that the defendant lacked the specific intent that Donald Burke be murdered, and thus, since that same intent is an essential element of the state's second prosecution, the state is collaterally estopped from proceeding with that prosecution. See *United States* v. *DeMarco,* supra, 836.

The ruling of the trial court is reversed and the case is remanded with direction to grant the defendant's motion to dismiss.

In this opinion the other justices concurred.