STATE OF CONNECTICUT *v.* KARIN APARO
(14443)

PETERS, C. J., GLASS, COVELLO, BERDON and SANTANIELLO, Js.

Argued June 2—decision released August 11, 1992

*Hope C. Seeley,* with whom, on the brief, was *Hubert J. Santos,* for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *James E. Thomas,* senior assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this appeal is whether the principles of double jeopardy and collateral estoppel prohibit the state from retrying, on a charge of conspiracy to commit murder, a defendant who has been acquitted of a charge of accessory to murder. The defendant, Karin Aparo, was charged with one count of murder as an accessory in violation of General Statutes §§ 53a-54a (a)[1] and 53a-8,[2] and one count of con-

---

[1] General Statutes § 53a-54a provides: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

[2] General Statutes § 53a-8 provides: "CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission

spiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[3] and 53a-54a (a). A jury acquitted her of the accessory charge but could not reach a verdict on the conspiracy charge. After the trial court declared a mistrial on the conspiracy count, the state announced its intention to retry the defendant on that count. The defendant filed a motion to dismiss all pending charges. Upon the trial court's denial of this motion, the defendant took an interlocutory appeal to the Appellate Court, which we transferred to ourselves pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).[4] We affirm in part and reverse in part.

The defendant has raised three issues on appeal. She maintains that the trial court should have granted her motion to dismiss and barred her retrial for conspiracy because: (1) principles of double jeopardy preclude retrial when six out of twelve jurors vote for acquittal; (2) principles of collateral estoppel preclude retrial, because the jury necessarily found that she had never intended that her mother be killed; and (3) principles of collateral estoppel require the exclusion of certain

of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-48 provides: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[4] "Colorable claims of double jeopardy are an exception to the general rule that appeals in criminal cases must ordinarily await the final judgment that arises from imposition of sentence." *State* v. *Boyd,* 221 Conn. 685, 688 n.4, 607 A.2d 376 (1992); *Abney* v. *United States,* 431 U.S. 651, 659–62, 97 S. Ct. 2034, 52 L. Ed. 2d 651 (1977).

evidence, leaving insufficient admissible evidence to warrant a retrial. We reject the first and second of these claims, and accept the third in part.

I

The defendant first claims that, because she obtained six votes for acquittal on the conspiracy count, and because that count could have been tried by a jury of six, the double jeopardy clause of the fifth amendment, which "serves to safeguard defendants in criminal proceedings against multiple punishments or repeated prosecutions for the same offense"; *State* v. *Aillon,* 182 Conn. 124, 127, 438 A.2d 30 (1980), cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1981); protects her against a second prosecution.

On February 17, 1988, the defendant moved to sever the murder and conspiracy counts on the ground, inter alia, that she was entitled under General Statutes §§ 54-82b (c) and 54-82 (c) to a jury of twelve for the crime of murder and a jury of six for the crime of conspiracy. On April 26, 1990, she supplemented her motion by arguing in the alternative that, if the court denied the motion to sever the counts, two juries should be empaneled, one of twelve jurors for the murder count and one of six jurors for the conspiracy count. The motion was denied and an exception was taken.

The vote on the mistried conspiracy count was seven to five for acquittal. The defendant contends that, having secured at least six votes in her favor, she is protected by principles of double jeopardy from retrial. She claims that this is so, first, because she alleges that the trial court should have granted her request for a jury of six on the conspiracy count, and second, because the factual elements of the conspiracy count were resolved in her favor by six jurors, the same number she would have to persuade on retrial.

Section 54-82b (c) provides: "In any criminal trial by a jury, except as otherwise provided by law, such trial shall be by a jury of six." Section 54-82 (c) provides that "no person, charged with an offense which is punishable by death or life imprisonment, shall be tried by a jury of less than twelve without his consent." We do not read these provisions to require that separate juries be provided when only some of the charges against a defendant are punishable by death or life imprisonment. Had the legislature intended such an extraordinary measure, it would have explicitly provided for it. In this case, had the defendant preferred a jury of six, she could have so elected.

We decline the defendant's invitation to speculate that, had she consented to a trial before a jury of six, it would have consisted of six of the seven jurors who voted for acquittal. Because the jury did not come to any conclusion, the vote tally is legally irrelevant. "It is settled doctrine in Connecticut that a valid jury verdict in a criminal case must be unanimous. . . . A nonunanimous jury therefore cannot render any 'finding' of fact." *State* v. *Daniels,* 207 Conn. 374, 388, 542 A.2d 306 (1988), cert. denied, 489 U.S. 1069, 109 S. Ct. 1349, 103 L. Ed. 2d 817 (1989). This claim is therefore without merit.

## II

Next, the defendant claims that collateral estoppel prevents the state from retrying her on the charge of conspiracy, because such a retrial would permit the state to relitigate issues necessarily decided in her favor in the first trial. Collateral estoppel is given constitutional dimensions by the double jeopardy clause. It is well established that retrial following a jury deadlock does not violate the constitutional provision against double jeopardy. *Aillon* v. *Manson,* 201 Conn. 675, 678, 519 A.2d 35 (1986); *State* v. *Aillon,* supra, 129–30.

We recently discussed in some detail the relationship between double jeopardy and collateral estoppel. In *State* v. *Hope,* 215 Conn. 570, 577 A.2d 1000 (1990), cert. denied, 498 U.S. 1089, 111 S. Ct. 968, 112 L. Ed. 2d 1054 (1991), we stated: "In a criminal case, collateral estoppel is a protection included in the fifth amendment guarantee against double jeopardy. *Ashe* v. *Swenson,* 397 U.S. 436, 445, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970). ' "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' Id., 443. 'Collateral estoppel applies in two ways: (1) it may bar prosecution or argumentation of facts necessarily established in a prior proceeding; or (2) it may completely bar subsequent prosecution where one of the facts necessarily determined in the former trial is an essential element of the conviction the government seeks. *United States* v. *Griggs,* 735 F.2d 1318 (11th Cir. 1984).' *United States* v. *DeMarco,* 791 F.2d 833, 836 (11th Cir. 1986).

"To establish whether collateral estoppel applies, the court must determine what facts were necessarily determined in the first trial, and must then assess whether the government is attempting to relitigate those facts in the second proceeding. *De La Rosa* v. *Lynaugh,* 817 F.2d 259, 263 (5th Cir. 1987); *United States* v. *Irvin,* 787 F.2d 1506, 1515 (11th Cir. 1986). 'A defendant who argues that *Ashe* is applicable to his case carries the burden of establishing that the issue he seeks to foreclose from consideration in the second case was "necessarily" resolved in his favor in the prior proceeding. *United States* v. *Seijo,* 537 F.2d 694, 697 (2d Cir. 1976), cert. denied, 429 U.S. 1043, 97 S. Ct. 745, 50 L. Ed. 2d 756 (1977).' *United States* v. *Castro,*

629 F.2d 456, 465 (7th Cir. 1980). Furthermore, when a defendant is acquitted of conspiracy and then retried on the substantive offense, 'if it can be determined that the first jury must have determined an ultimate fact common to the conspiracy and substantive crimes in the defendant's favor, acquittal of conspiracy may prevent the government from introducing the evidence necessary to convict the defendant of the substantive offense in a subsequent trial.' *United States* v. *Bollinger,* 796 F.2d 1394, 1406 (11th Cir. 1986).

" 'The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Sealfon* v. *United States,* 332 U.S. 575, 579 [68 S. Ct. 237, 98 L. Ed. 180 (1948)]. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.' *Ashe* v. *Swenson,* supra, 444." *State* v. *Hope,* supra, 584–85.

In *Hope,* the state sought to prosecute the defendant for aiding and abetting murder after the defendant had been acquitted of conspiracy to commit capital felony murder and the lesser included offense of conspiracy to commit murder. We held that the trial court should have granted the defendant's motion to dismiss,

because in the earlier prosecution the jury had necessarily determined that the defendant lacked the specific intent that the victim be murdered. Because that same intent would have been an element essential to the prosecution for aiding and abetting murder, the state was collaterally estopped from proceeding with that prosecution. Id., 588–89.

The defendant here claims that, as in *Hope,* issues that the state would have to prove at retrial were necessarily resolved in her favor by the jury in the first trial. To evaluate this claim we must decide, first, whether *Ashe* v. *Swenson,* supra, applies when a jury acquits on one count in a multicount indictment and does not reach a verdict on another count. *Ashe* v. *Swenson,* supra, 443, held that collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the parties in any *future* lawsuit." (Emphasis added.) *Ashe* involved two successive proceedings against the defendant, whereas here jeopardy continues to attach from the first trial; see 3 W. LaFave & J. Israel, Criminal Procedure (1984) p. 75; and the jury could permissibly have returned inconsistent verdicts in the first trial. See *United States* v. *Powell,* 469 U.S. 57, 68–69, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984). It may, therefore, be argued that extending collateral estoppel to the context of a retrial on one or more counts of a multicount indictment cannot be reconciled with the rule that inconsistent verdicts are permissible. Moreover, because jeopardy continues, it is arguable that the second trial is not a "future lawsuit" for *Ashe* purposes. The United States Supreme Court has not addressed this issue, and it is a question of first impression for this court.

Courts that have considered the issue have held "with virtual unanimity" that collateral estoppel bars the state from relitigating a question of fact that was deter-

mined in the defendant's favor by a partial verdict. *United States* v. *Mespoulede,* 597 F.2d 329, 336 (2d Cir. 1979); see *United States* v. *Frazier,* 880 F.2d 878, 882–83 (6th Cir. 1989), cert. denied sub nom. *DeBusk* v. *United States,* 493 U.S. 1083, 110 S. Ct. 1142, 107 L. Ed. 2d 1046 (1990); *United States* v. *Mespoulede,* supra, 336–37 (citing cases). We are persuaded by the reasoning of those cases.

"We tolerate inconsistencies in unified jury verdicts in criminal cases, not because of any singular virtue we attribute to inconsistency, but rather out of deference to the nature of the jury and the role it plays in our jurisprudence. There is no question but that a jury in a criminal trial has the power to render a verdict of acquittal that is wholly at odds with the law and the facts. . . . We recognize that the jury is in a sense the conscience of the community and can, for example, render a verdict to mitigate an overly severe punishment. . . . Similarly, in compromising in order to reach a unanimous verdict, a jury is often fulfilling its role as a cross-section of the community that it is supposed to represent. Occasional anomalies are the price of unanimity. . . .

"Internal inconsistency, then, is not an end in itself, and it would be irrational to expand gratuitously the judicial tolerance of inconsistent verdicts to permit different juries in successive trials to reach contradictory results. Allowing a second jury to reconsider the very issue upon which the defendant has prevailed . . . implicates concerns about the injustice of exposing a defendant to repeated risks of conviction for the same conduct, and to the ordeal of multiple trials, that lie at the heart of the double jeopardy clause." (Citations omitted; internal quotation marks omitted.) *United States* v. *Mespoulede,* supra, 336–37.

We, therefore, reach the merits of the defendant's claim. In order to do so, we must examine the evidence that was presented to the jury that led it to acquit the defendant of the charge of aiding Dennis Coleman in the murder of her mother but to disagree on the charge of her conspiring with Coleman for the same purpose.

## A

The defendant and Coleman gave contradictory testimony concerning the events leading up to the murder of the defendant's mother, Joyce Aparo. Coleman testified that the defendant, for more than a year preceding the murder, had repeatedly begged him to kill her mother, and that they had planned the murder together in detail the night before he did it. The defendant testified that she had never made any such request, and that she had not known that the murder would take place.

Coleman's testimony was as follows. In 1986 and 1987, the defendant lived with her mother in Glastonbury. In June, 1986, Coleman, then eighteen years old, met and began dating the defendant, who was fifteen years old. During the summer of 1986, the defendant and Coleman began a sexual relationship. At that time, they discussed the defendant's unhappiness with her life at home with her mother, with whom she had a painfully difficult relationship. At first they discussed a plan whereby the defendant would leave her mother and Coleman would become her guardian, but this plan was abandoned when they discovered that the defendant would have to be sixteen years old in order to select her own guardian. The defendant then initiated a discussion with Coleman about killing her mother.

These discussions continued throughout the summer of 1986. At one point, Coleman and the defendant discussed a plan whereby the defendant would stab her mother and then claim self-defense. This plan was aban-

doned when the defendant decided that she could not go through with stabbing her mother herself. They then decided that the defendant would flick the lights of her house as a signal for Coleman, who lived nearby, to come over and kill the victim. The lights did flash, but Coleman did not enter the house.

Coleman's testimony with respect to this incident was supported by a letter written to him by the defendant at that time stating that "[p]romises are very nice but I was taught never to promise anything unless I had an intention of carrying it out," that "I told you that you wouldn't be able to," that "I didn't ask you this time. You offered," and "Don't promise freedom when you don't have the keys to the cage. It's not fair!" Coleman testified that he had discussed this letter with the defendant and had assured her that he would keep his promise to her.

On a subsequent occasion, while Coleman was visiting the Aparo home, the defendant told him that she was going to put some sleeping pills into a sandwich that she was making for her mother. Coleman did nothing to stop her. Joyce Aparo took one bite of the sandwich, but decided that the relish was bad and sent them out to buy new relish.[5]

The evidence included other letters that Coleman and the defendant had written to each other during that summer. In one letter, Coleman stated "[a]ny sacrifice I will make," "[s]oon—for you—I will give my soul to something black," and "[y]ou know I would kill for you." The defendant wrote to Coleman: "I will do whatever is necessary. It is a decided thing and I will do it even if you won't help me. It is just another thing to do on my 'priority list' & right now it has a very high

---

[5] The jury was instructed that they could only use the evidence of the sandwich incident as evidence of intent, but that they could not substitute it for the acts with which the defendant was charged.

billing." In the same letter, she also wrote, "[l]eave the logistics to me unless you want to help," and "[m]y God, do you realize what we're thinking?" In the last of the letters from the summer of 1986 that were introduced into evidence, the defendant stated that she knew they could not follow through on their plan. "Being realistic we both know we could never hurt my mom. I know I couldn't have stood by while someone else did." Thereafter, the conversations about killing Joyce Aparo tapered off. The defendant and Coleman continued to see each other on an almost daily basis until the spring of 1987.

In early May, 1987, the defendant began spending the weekends at the Rowayton home of her violin teacher, Albert Markov. When Coleman became upset about the effect of her absences on their relationship, the defendant explained that she was trying to get away from her mother. She also told Coleman that she was in love with Alex Markov, her teacher's son. Later in May, she suggested to Coleman that they should stop communicating for a month, and he agreed. When they next spoke in late June, she told Coleman that she had had sexual relations with Alex Markov, but that her relationship with Markov had become platonic. From July 7 to 14, she traveled with Alex Markov to Woodstock, New York. While there, she spoke with Coleman several times by telephone. He then believed that the defendant's relationship with Alex Markov was platonic, but he was suspicious. Coleman testified that his relationship with the defendant during this time was "stressful."

After the defendant's return from Woodstock, discussions about killing Joyce Aparo resumed. The defendant told Coleman that her mother was forcing her to stay in Rowayton and to continue her relationship with Markov. Toward the end of July, she told Coleman that she, her mother, Albert Markov and Alex

Markov would shortly be traveling to Binghamton, New York, for three or four days. Two times during the week before the trip, the defendant spoke to Coleman through her bedroom window. During the first of these conversations, the defendant cried and demanded that her mother be killed soon because she could not stand it any more. During the second conversation, the defendant said that it had to be done before the trip, because she could not bear the thought of having to go on vacation with her mother and the Markovs. They then discussed killing Joyce Aparo by holding a rag saturated with bleach and ammonia over her face or by strangling her. They agreed that Coleman would come into the house that night, kill the victim, and carry away the body, and that the defendant would clean up and wipe away fingerprints afterward. Coleman lost his nerve, however, and did not go through with his part of the plan. The next day, shortly before leaving for Binghamton, the defendant telephoned Coleman. At first she was upset that he had not carried out the plan, but then became "more understanding," and told him that she would be home on August 4. She asked him to go to the Aparo home, to let himself in with a key she had previously given to him, and to feed her cats, which he agreed to do. They agreed to carry out the murder plan on August 5. During one of the visits to feed the cats, Coleman put a note between the sheets of the defendant's bed stating, "I will do the deed."

On August 4, the defendant, who had returned from Binghamton and was staying in Rowayton, spoke four times by telephone with Coleman. She first told him to kill her mother the following day after the victim had gone to bed, and then, in a later conversation, changed the plan, asking him to kill her mother that night while the defendant was still in Rowayton, because she did not want to be at home when it happened. In the third conversation, the defendant insisted

that the body be left where it could be found, so that the victim's life insurance would be paid to the defendant. During the last conversation, Coleman informed the defendant that a friend had agreed to help him.

At 1 a.m. on August 5, Coleman, accompanied by two friends, entered the Aparo home and strangled Joyce Aparo in her bed with a pair of pantyhose. Coleman and his two friends then took the body away in the victim's car, and abandoned the body and the car in Bernardston, Massachusetts.

Coleman's testimony was supported by that of two friends of the defendant. Shannon DuBois testified that on August 6, the defendant had told her that Coleman had committed the murder. The defendant had told DuBois that she and Coleman had discussed killing her mother on five different occasions, and that they had discussed a number of ways of committing the murder, including the use of chloroform, stabbing her mother, and cutting the brake lines of her mother's car. The defendant had also described the sandwich incident. The defendant had said that she had spoken with Coleman the night before the murder, and had not wanted to be there when it happened, but had planned to come back the next day, clean up the house, and call the police. Another friend, Jill Smith, testified that several months after the murder, the defendant had told Smith that Coleman had called her on the night of the murder, that he had been upset that she was not in Glastonbury, and that he had told her that he would kill her mother. The defendant had also told Smith that she had not thought that Coleman was serious, because on prior occasions he had said he would kill Joyce Aparo and had not followed through.

The state offered other evidence of actions by the defendant after Joyce Aparo's death that, it claimed, demonstrated her consciousness of guilt. Beverly

Warga, an administrative secretary at the police department, testified that on August 5, 1987, she had overheard a telephone conversation in which the defendant had asked, "Where did you do it? Did you hurt your head? Don't worry about it, I'll be there soon. I'll take care of you." Ann Marie Murray, who had been a coworker of Joyce Aparo's, testified that on August 6, 1987, the defendant had stated that she would be getting $300,000 from an insurance policy. There was evidence that the defendant had concealed evidence and had lied to the police about her knowledge that Coleman had committed the murder, and that she had had sexual relations with Coleman twice after he was arrested. On August 20, 1987, she wrote a letter to Coleman stating, "I really believe that we'll turn out O.K. Even if we both have to spend 25 years in jail."

The defendant, who testified on her own behalf, denied that she had requested or aided Coleman to kill her mother. She testified that her diary entries, which had been admitted into evidence and which stated that "Den & I have our plot" and "Update: Will not carry out plan," referred to her plan with Coleman to run away and get married. She testified that her "priority list" letter had also referred to her plan to run away.

She admitted that there had been a single actual discussion of killing her mother, and that this had led to the flicking of the lights incident. The discussion occurred after her mother had threatened to break up her relationship with Coleman, and she told Coleman that she wished her mother would die. He responded by suggesting that the defendant kill her mother and claim self-defense. When the defendant rejected this suggestion, he offered to do it himself by hiding in the house while they were away. The defendant then said that it would be better for him to be outside the house, and for her to signal him by flashing the lights. The idea was then dismissed as irrational. Later that day,

however, the defendant and her mother did go out, and when they returned, her mother accidentally flicked the lights off and on. This frightened the defendant, who locked the door and drew the curtains. The defendant acknowledged that two of her letters to Coleman had referred to this incident. She testified, however, that she had not intended to kill her mother.

The defendant admitted that, after one bitter argument after her mother had found a note discussing the defendant's plan to run away with Coleman, she had crushed two of her mother's Fiorinal tablets and put them in her mother's sandwich. Her intention, however, had been not to kill her mother, but only to calm her down.

After the defendant began spending time with Alex Markov in May, 1987, her relationship with her mother improved. During this same time, her relationship with Coleman began to dissolve, and after she began sleeping with Markov, she suggested to Coleman that they separate for a month so that she could work out her feelings. Several witnesses and her diary entries corroborated her testimony that her relationship with her mother had been improving during this time.

The defendant testified that she had lied to Coleman when she had said that she did not want to go to Binghamton and that her mother was forcing her to do so. She testified, and her diary indicated, that she had been looking forward to the trip and to going to parties with Markov. She had done this because she had not wanted Coleman to think that she "was voluntarily spending time with Alex" and because she "knew he was jealous."

In the August 4 telephone conversations, the defendant testified, she had not discussed killing her mother at all, but rather had telephoned Coleman to tell him that it would no longer be necessary for him to feed

the cats, because her mother had returned home. Coleman had been angry at her mother for making her stay in Rowayton and had said, "sometimes I just wish I could kill her."

In order to explain certain of her statements and actions, the defendant also presented evidence that she had been physically and emotionally abused by her mother. Numerous witnesses testified about the abuse, and reports were introduced that had been prepared by the Department of Children and Youth Services, which several times had investigated allegations of abuse, and by Norwalk Hospital, which had treated the defendant after a suicide attempt when she was twelve years old. Two psychiatrists, John Cegalis and Walter Borden, testified as expert witnesses on the defendant's behalf. Both opined that she fit the profile of an abused and battered child and suffered from post traumatic stress disorder. Cegalis testified that the defendant's expressions of desire for her mother's death did not indicate an intent to kill, but rather a fantasy that was normal in an abused child. Cegalis also said that the defendant's continuation of her relationship with Coleman, knowing that he had murdered her mother, was not abnormal for a battered child, because such children have a "morbid fear" of being rejected or abandoned. In light of her ambivalent feelings about her mother, Cegalis stated that "it would be understandable" for her to wish to hold onto, and even to try to protect, the one important person left in her life.

The defendant also presented evidence that Coleman had acted on his own in order to terminate the defendant's relationship with Markov, which Joyce Aparo had been encouraging. On cross-examination, Coleman admitted that he had been jealous of the defendant's relationships with other men, and that he had been depressed and upset as a consequence of her relationship with Markov. He testified that in late July, 1987,

when the defendant asked him what he would do if he knew that she and Markov had had sexual intercourse twenty times, "I told her that if that was true, I would drive off the road and kill us both." He said that on August 3, 1987, while he was in the Aparo home feeding the cats, he had become upset when he saw a pile of photographs of the defendant with Markov. He acknowledged that he had previously stated that he felt that it had been a situation of self-defense, in that it came down to Joyce Aparo or himself.

## B

The defendant claims that the trial court improperly denied her motion to dismiss the conspiracy count on grounds of collateral estoppel. We do not agree.

In the present case, in order to acquit the defendant of being an accessory to murder, the jury would have had to find either that (1) she did not intend that her mother be killed, or (2) she did not solicit, request, command, importune, or intentionally aid Coleman to commit the murder, or (3) both.[6] On the other hand, in order

---

[6] The defendant, noting that the trial court, over her objection, instructed the jury that it had to find that "she intended to aid, assist *or join* Dennis Coleman in the commission of the murder of her mother," (emphasis added) claims that this instruction collapsed the distinction between the accessory and conspiracy statutes, so that acquittal of one necessarily implied acquittal of the other. The defendant argues that, because the ordinary meaning of "join" is "agree," and because agreement is the only element of conspiracy that will be an issue in the new trial (Joyce Aparo's death making the existence of an overt act indisputable), the jury necessarily found that the defendant did not conspire with Coleman.

Taken in context, however, the court's instruction does not support the defendant's argument. The court stated: "There are three elements the State must prove beyond a reasonable doubt in order to warrant a conviction: First, the defendant intended to cause the death of her mother; second, with the intent to cause her mother's death, she solicited, requested, commanded, importuned or intentionally aided Dennis Coleman to cause her mother's death; and, third, acting with these intentions, she intended to aid, assist or join Dennis Coleman in the commission of the murder of her mother." The defendant correctly noted that the third of these elements

for the jury on retrial to convict the defendant of conspiracy, "it must be shown that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . Further, the prosecution must show both that the conspirators intended to agree and that they intended to commit the elements of the underlying offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Lewis,* 220 Conn. 602, 606–607, 600 A.2d 1330 (1991).

The defendant claims that, because it is undisputed that she aided Coleman by telling him that the victim was home alone, the verdict of acquittal demonstrates that the jury necessarily found that she did not have the intent to kill her mother. Since the state would have to prove such an intent in order to convict her of conspiracy, she contends, collateral estoppel bars a retrial on that charge. We do not agree.

"We have previously stated that a conviction under § 53a-8 requires proof of a dual intent, i.e., that the accessory have the intent to aid the principal and that in so aiding he intend to commit the offense with which he is charged." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Foster,* 202 Conn. 520, 525–26, 522 A.2d 277 (1987). Accessorial liability "is designed

---

was not in the statute. As given, however, this instruction clearly separates the question of the defendant's intent to join Coleman from that of whether she solicited, requested, commanded, importuned, or intentionally aided Coleman to commit the murder. The jury was not told that its resolution of the former question would answer the latter as well. On the contrary, the court stated that "if you find that the State has failed to prove any one of these elements to you beyond a reasonable doubt, you must find the defendant not guilty." The instruction, although incorrect, did not weaken the state's burden of proving accessorial acts and did not permit the jury to substitute a conspiracy for such acts.

to punish one who intentionally aids another in the commission of a crime and not one whose innocent acts in fact aid one who commits an offense." Id., 531.

Although the defendant concededly told Coleman that her mother was home on the night of the murder, the jury could reasonably have found, on the basis of either Coleman's or the defendant's testimony, that although she may have wanted to kill her mother, she did not make *this* statement with the intention that it result in her mother's death. According to the defendant, the reason she told Coleman that her mother was home was to indicate that it would no longer be necessary for him to go to the house to feed the cats. Coleman testified that the defendant had told him, during their first conversation on August 4, either that her mother was home alone or that her mother was coming home. At the time of that conversation, according to Coleman, the defendant's plan was for her mother to be killed the following night. By that time, the information that Joyce Aparo was home alone on August 4 would obviously have become too stale to be useful in the commission of the crime. Only in a later conversation did the defendant change the plan and ask him to kill her mother that night. Thus, even if the jury believed Coleman's account, it might have concluded that at the time the defendant told him her mother was or would be home alone, she did not know that this information would aid him in the commission of the murder. The aid would then have been analogous to the defendant's act in giving Coleman the key that he used to enter the house the night of the murder. Coleman testified on cross-examination that she had done this a number of months before, and had not done so for the purpose of helping him to kill her mother.

Given the numerous conflicts between the defendant's and Coleman's testimony, the jury could have chosen to disbelieve all or part of the latter. The jury might

reasonably have concluded that Coleman was untrustworthy because he was jealous of the defendant's relationships with other men and was angry at the defendant for his present predicament, and because he desired to shorten his prison sentence by currying favor with the authorities. The jury therefore might, for example, have decided to believe only those portions of his testimony that were corroborated by DuBois and Smith, both of whom testified that the defendant had admitted discussing the murder with Coleman shortly before he killed Joyce Aparo, but neither of whom testified that the defendant had requested Coleman to do so. Mere knowledge that a crime is going to be committed is not sufficient to establish liability as an accessory if the defendant does not encourage or intentionally aid in the commission of the crime. See *State* v. *Wakefield*, 88 Conn. 164, 172–73, 90 A. 230 (1914). The jury's conclusion that there was a reasonable doubt as to whether the defendant had solicited, requested, commanded, importuned, or intentionally aided Coleman would, therefore, not be inconsistent with the conclusion that the defendant had entered into a conspiracy to commit murder.[7] We conclude, therefore, that the principle of collateral estoppel does not bar the state from retrying the defendant for conspiracy to commit murder.

## C

Finally, the defendant claims that much of the evidence that the state relied upon in the first case must be excluded from a retrial on the basis of collateral estoppel, and that the evidence that remains is insufficient to justify placing her on trial a second time, at least in the adult division of Superior Court. Specifi-

[7] The question of whether the evidence was sufficient to support a conviction for conspiracy has not been briefed or argued, and nothing in this opinion should be understood to prejudge this issue, which is likely to arise again on retrial.

cally, the defendant claims that the acquittal on the charge of being an accessory to murder shows that the jury necessarily disbelieved all the state's evidence regarding her activities and her state of mind from July 14 to August 5, 1987, the period during which the information charged that she had been an accessory. Therefore, she contends, the state may introduce into evidence only the conversations she had with Coleman during the summer of 1986, when she was fifteen years old.[8] She further asserts that General Statutes § 46b-121 assigns to the Juvenile Matters of the Family Division of the Superior Court exclusive original jurisdiction over children under sixteen years of age who commit delinquent acts, and that the information therefore must be dismissed for lack of jurisdiction or, in the alternative, that the case should be transferred to the Juvenile Matters docket.

This argument fails at its first juncture. As we have already noted, the defendant's acquittal on the charge of being an accessory to murder does not necessarily indicate that the jury disbelieved all of the state's evidence of her conduct after she turned sixteen years old. On the contrary, the jury could have reached the result it did if it believed every piece of that evidence except those parts of Coleman's testimony that directly indicated that the defendant had solicited, requested, commanded, importuned, or intentionally aided him in the murder of Joyce Aparo.

The trial court, however, rejected all of the defendant's collateral estoppel claims and refused to limit in any way the evidence that the state could introduce at the second trial. "[T]he state is not barred from putting Dennis Coleman or any other witness who testified in the first trial on the witness stand in the second trial. An acquittal on the First Count does not neces-

---

[8] The defendant turned sixteen on February 12, 1987.

sarily mean that the jury rejected any witness' testimony in toto." We agree with the last sentence just quoted, but disagree with the conclusion that Coleman's testimony will, therefore, be admissible in its entirety.

Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe* v. *Swenson,* supra, 443. "In a criminal context, the doctrine prohibits the government from forcing a defendant to defend against charges or allegations which he overcame in an earlier trial." *United States* v. *Gornto,* 792 F.2d 1028, 1031 (11th Cir. 1986). "For estoppel to apply, the fact sought to be foreclosed by [the] defendant must necessarily have been determined in his favor in the prior trial; it is not enough that the fact *may* have been determined in the former trial." (Emphasis in original.) *United States* v. *Irvin,* supra, 1515. The defendant has the burden of showing "that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." *Dowling* v. *United States,* 493 U.S. 342, 350, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990); see id., 350–51.

The state maintains that *Dowling* v. *United States,* supra, establishes that a prior acquittal does not automatically preclude the state from using evidence presented in the first trial. *Dowling* held that, under the facts there presented, collateral estoppel did not bar the introduction of evidence of a crime that the defendant had previously been acquitted of committing. Dowling was first tried and acquitted for robbery A. Thereafter, he was prosecuted for robbery B, which (unlike the two robberies for which the defendant was successively tried in *Ashe* v. *Swenson,* supra) occurred at a different time and place. In that trial, evidence of his conduct in committing robbery A was offered to prove his identity as the perpetrator of robbery B: in

both robberies, the perpetrator had worn a ski mask, had carried a small pistol, and had been accompanied by a man named Delroy Christian. The court held that this did not constitute double jeopardy, noting that, "unlike the situation in *Ashe* v. *Swenson,* the prior acquittal did not determine an ultimate issue in the present case." *Dowling* v. *United States,* supra, 348. The court noted that, under the relevant rule of evidence, a similar act by the defendant is relevant if the jury can reasonably conclude that the act occurred and that the defendant was the actor. Id. Because the second trial did not require the state to prove Dowling's participation in robbery A beyond a reasonable doubt, the doctrine of collateral estoppel was inapplicable. Id., 348–50. Moreover, an examination of the record revealed that the acquittal did not necessarily represent a jury determination that the defendant had not been one of the masked men who had participated in robbery A. Id., 350–52.

Whether it is *Ashe* or *Dowling* that controls the admissibility of evidence in a case such as this depends on whether, as a general matter, the prosecution on retrial "may constitutionally rely on the same evidence or even the same theory relied upon in a former proceeding as long as the prosecution also presents an alternative—some other evidence or theory—on which the jury may base its verdict." A. Poulin, "Collateral Estoppel in Criminal Cases: Reuse of Evidence After Acquittal," 58 U. Cin. L. Rev. 1, 12 (1989) (hereinafter "Collateral Estoppel"). The answer to that question depends on how the line is drawn between proof of ultimate facts and proof of predicate or evidentiary facts. Evidence of predicate facts, rather than ultimate facts, need not be proven beyond a reasonable doubt; *State* v. *Williams,* 220 Conn. 385, 398, 599 A.2d 1053 (1991); and is, therefore, not barred by collateral estoppel.

Where evidence of a crime of which the defendant has previously been acquitted is sufficient, but not necessary, to prove an ultimate fact in a later trial, it is in theory possible for the jury to use that evidence only to cast light on other facts not previously litigated, and to use those other facts as the primary basis of conviction. In that case, the crime previously tried would only be a predicate fact.[9] It is, however, equally possible that the second jury will convict the defendant solely on the basis of conduct that the first jury had found not to be proven beyond a reasonable doubt.[10] In such cases, "the close relationship between the charged offense and the acquitted offense creates a risk that

[9] If all proof of ultimate facts could thus be transformed by hypothesis into proof of evidentiary facts, then the doctrine of collateral estoppel would be inapplicable in any case in which a retrial was permissible, and thus would never act to bar evidence. See A. Poulin, "Collateral Estoppel in Criminal Cases: Reuse of Evidence After Acquittal," 58 U. Cin. L. Rev. 1, 8–9 (1989). *Dowling* v. *United States,* 493 U.S. 342, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990), does not suggest, however, that the court intended to discard the well established rule that collateral estoppel may exclude evidence in certain cases; see id., passim; annot., "Admissibility of Evidence as to Other Offense as Affected by Defendant's Acquittal of that Offense," 25 A.L.R.4th 934 (1983 & Sup. 1991); and courts have continued to apply that rule after *Dowling.* See, e.g., *United States* v. *Seley,* 957 F.2d 717, 722 (9th Cir. 1992); *United States* v. *Blackwell,* 900 F.2d 742, 745–46 (4th Cir. 1990); *Maryland* v. *Baxter,* 92 Md. App. 213, 607 A.2d 120 (1992); *Eatherton* v. *Wyoming,* 810 P.2d 93 (Wyo. 1991).

[10] No jury charge can be crafted that would permit the jury to use the challenged evidence for the permissible purpose while preventing the jury from using it for the impermissible purpose. Even the best intentioned jury probably could not follow such an instruction. Ordinary experience teaches us that once a person has arrived at a belief, that person will often be hard put to say which evidence was determinative in forming that belief and which evidence was merely helpful. Once the evidence is admitted, therefore, a risk exists, which court and jury alike are powerless to prevent, that the defendant's constitutional rights will be violated. We note that limiting instructions have been held to be inadequate where the jury has heard and been told to disregard compelling evidence of the defendant's guilt that was constitutionally inadmissible. See, e.g., *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968) (codefendant's confession admitted only against codefendant); *Jackson* v. *Denno,* 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964) (allegedly involuntary confession).

the jury will convict the defendant because the jury concludes beyond a reasonable doubt that the defendant committed the criminal conduct of which the prior jury acquitted the defendant. Collateral estoppel should protect the defendant against that risk . . . ." A. Poulin, "Collateral Estoppel," supra, 23. We conclude that evidence of crimes of which the defendant has previously been acquitted, and concerning which the prior jury demonstrably harbored a reasonable doubt, should be excluded when it "would establish an element of the charged offense and could therefore form the basis of the conviction . . . ." A. Poulin, "Collateral Estoppel," supra, 33; see *Maryland* v. *Baxter,* 92 Md. App. 213, 219–20, 607 A.2d 120 (1992); *Eatherton* v. *Wyoming,* 810 P.2d 93, 103–104 (Wyo. 1991).

In the case now before us, at least some of the evidence that, if believed, would have established the defendant's guilt of being an accessory to murder, would also have established that, intending that the crime of murder be performed, she entered into a conspiracy with Coleman. "In *Dowling,* the prior crime evidence was relevant to an essential element but would not itself, if proved, establish that essential element." A. Poulin, "Double Jeopardy: *Grady* and *Dowling* Stir the Muddy Waters," 43 Rutgers L. Rev. 889, 906 (1991). In this case, however, like *Ashe* and unlike *Dowling,* the prior acquittal indicates that the jury necessarily rejected some evidence that, if believed, could establish essential elements of conspiracy, specifically agreement, intent to agree, and intent to kill. For example, Coleman testified that during the August 4 telephone conversations, the defendant first told him to kill her mother the following day after the victim had gone to bed, and then, in a later conversation, changed the plan, asking him to kill her mother that night while the defendant was still in Rowayton, because she did not want to be at home when it hap-

pened. Assuming, as we are required to do, that the jury complied with the court's instructions, its acquittal on the accessory charge requires the conclusion that it found that these alleged facts had not been proven beyond a reasonable doubt.[11] "Once a jury had determined upon conflicting testimony that there was at least a reasonable doubt that [the defendant had made those statements], the State could not present the same or different . . . evidence in a second prosecution . . . in the hope that a different jury might find that evidence more convincing." *Ashe* v. *Swenson,* supra, 446.

The trial court's conclusion that no evidence should be excluded must, therefore, be reconsidered in light of the test we have articulated today. That test clearly indicates that the state may not introduce Coleman's testimony that the defendant requested, on the night before the murder took place, that Coleman kill her mother. The jury in the first trial demonstrably harbored a reasonable doubt as to the truth of that alleged fact and, if that fact were found to be proven beyond a reasonable doubt by the jury in the second trial, it would establish an element of the charged offense of conspiracy and could, therefore, form the basis of a conviction. With respect to other facts that the state may seek to prove, it would not be appropriate, on the present record, for us to anticipate evidentiary rulings on retrial. The trial court must exclude evidence offered in the first trial if (1) it can be demonstrated that the jury, in acquitting the defendant of the accessory count

---

[11] The state, noting that accessorial liability is in most cases based on physical acts, contends that the jury may have believed Coleman, "but nevertheless concluded that the defendant's verbal acts did not rise to the level of accessorial liability needed for conviction of murder." Inasmuch as four of the five accessorial acts specified in General Statutes § 53a-8—soliciting, requesting, commanding, or importuning—are necessarily verbal acts, we think that the jury could not have reached such a conclusion without disobeying its instructions and nullifying the statute.

in the first trial, harbored a reasonable doubt as to the truth of the fact sought to be proven, and (2) the alleged fact, if proven, would establish an element of the offense of conspiracy and could, therefore, form the basis of a conviction on that count.

The decision of the trial court is affirmed in part and reversed in part, and the case is remanded to the trial court for further proceedings consistent with this opinion.

In this opinion the other justices concurred.

