STATE OF CONNECTICUT *v.* GARRY GARNER
(SC 16710)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued February 17—officially released August 3, 2004

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, *Joseph T. Corradino*, senior assistant state's attorney, and *Pamela J. Esposito*, assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Garry Garner, was convicted of two counts of capital felony in violation of General Statutes (Rev. to 1997) § 53a-54b (8) and

(9),[1] two counts of murder in violation of General Statutes § 53a-54a,[2] and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48[3] and 53a-54a for the deaths of Karen Clarke and Leroy Brown. Following a jury trial, the court sentenced the defendant to life imprisonment without the possibility of release to be served consecutively with his federal sentence for narcotics violations. This appeal followed. We affirm the judgment of the trial court.

Prior to trial, the defendant filed a motion to suppress any in-court and out-of-court identifications of the defendant that the state might try to elicit from witnesses, on the ground that the police identification procedures had been unnecessarily suggestive and rendered any identification of the defendant unconstitutionally unreliable. The defendant also filed a motion to dismiss the murder and capital felony charges on the ground that the principal had been acquitted of those charges. After a hearing, the trial court denied both motions.

The defendant claims on appeal that the trial court improperly: (1) denied the motion to exclude the identi-

---

[1] General Statutes (Rev. to 1997) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) murder of two or more persons at the same time or in the course of a single transaction; or (9) murder of a person under sixteen years of age."

In 2001, the legislature redesignated certain subdivisions of § 53a-54b. See Public Acts 2001, No. 01-151, § 3. Subdivisions (8) and (9) of General Statutes (Rev. to 1997) § 53a-54b currently are codified at subdivisions (7) and (8) of § 53a-54b.

[2] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[3] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

fications; (2) denied the motion to dismiss the charges of murder and capital felony; and (3) instructed the jury that it could find the defendant guilty of murder and capital felony on the basis of conspiratorial liability pursuant to *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). The defendant also argues that the evidence was insufficient to support his conviction.[4] We conclude that the court properly denied the motion to suppress and the motion to dismiss, and that the court's instructions regarding *Pinkerton* liability were proper. We further conclude that the evidence was sufficient to support the defendant's conviction.

The jury reasonably could have found the following relevant facts. The defendant was an associate of Russell Peeler (Russell), who ran an illicit crack cocaine operation in the city of Bridgeport. Russell ran the drug operation with his brother, Adrian Peeler (Adrian).

[4] The defendant also claims that the imposition of two life sentences for Brown's death violated the constitutional prohibition against double jeopardy. The defendant concedes that this issue is unpreserved and seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because we conclude that the double jeopardy clause was not violated, the defendant fails to meet the third prong of *Golding*.

The defendant specifically claims that his convictions for violating § 53a-54b (8) and (9), now (7) and (8), were predicated on the same offense, the murder of Brown. We disagree because the premise of the defendant's argument, namely that the court imposed two sentences of life imprisonment without release for the murder of Brown, is not supported by the record. The court merged the defendant's murder conviction for Brown with his capital felony conviction for violating § 53a-54b (9), now (8), murder of a person under sixteen years of age. The court also merged the defendant's murder conviction for Clarke with his capital felony conviction for violating § 53a-54b (8), now (7), murder of two or more persons. In this respect, the murder of Brown under that capital felony conviction was simply the aggravating factor that raised the murder of Clarke to a capital felony. The defendant, therefore, received only one sentence for each murder and, accordingly, we conclude that there has been no violation of the double jeopardy clause. We reserve for another day the issue of whether a double jeopardy violation would exist had the defendant received two sentences for the capital felony of only one victim.

Rudy Snead began assisting Russell with the drug operation when Adrian was incarcerated in federal prison for narcotics violations until April, 1998.

Following a dispute, Russell attempted to murder Snead in September, 1997. Russell was in a car with several of his drug operation associates, including his cousin, Ryan Peeler, Shawn Kennedy, Corey King and Kybarris Taylor, when he saw Snead's car at a barbershop in Bridgeport. Russell followed Snead's vehicle after Snead left the barbershop. Russell's car pulled up alongside Snead's car and Russell shot at Snead, injuring him. Two small children were in the backseat of Snead's car at the time of the attempted murder. One of the children, Brown, was the son of Snead's girlfriend, Clarke.

Russell was charged with attempt to commit murder but was released after he posted bond. In May, 1998, he succeeded in murdering Snead. He was subsequently charged with murder and was again released when he posted bond. As a condition of his release, the court imposed a curfew and ordered that he wear an electronic bracelet so that his compliance with the curfew could be monitored.

After his release, Russell tried to discover the identities of the state's witnesses in the pending murder case. He told Angelina Keene, King and Kennedy that he would kill the witnesses once he knew who they were. He suspected that Clarke and Brown, among others, were the state's witnesses because he knew that Brown was in the back of Snead's car during the attempted murder. After Snead's murder, the Bridgeport police had protected Clarke and Brown as undisclosed witnesses for the state, but they discontinued protection when Clarke and Brown moved to a house on Earl Avenue in Bridgeport.

Norman Williams owned the house at 200 Earl Avenue, which was across the street from the Clarke residence, and lived there with his son, Marcus Williams, Josephine Lee and Kathy Esposito. All of them used crack cocaine. Russell regularly visited 200 Earl Avenue to use the kitchen to "cook" crack cocaine. In exchange for the use of the kitchen, he gave Norman Williams some of the finished product. In addition, Russell frequently sold crack cocaine to Norman Williams and delivered it to the house. He visited the house with various associates, including the defendant. One afternoon, when Russell was at 200 Earl Street to deliver crack cocaine, he saw Brown in the driveway across the street. Brown froze and ran inside his house when he saw Russell. At that time, Russell became convinced that Brown was one of the witnesses he had been looking for. He began to speak openly about killing Brown and his mother.

Lee testified that Russell was at 200 Earl Avenue on January 6, 1999. He went into the front room of the house and surveyed the Clarke house with one of his associates. Later, the defendant came to the house to deliver some crack. When Lee left the house to buy cigarettes, she noticed the defendant walking back and forth on the street in front of the Clarke house but he was gone when she returned.

Later that day, Adrian arrived at the house. Lee had a conversation with Adrian and Russell in which Russell asked Lee to kill Clarke and Brown. She refused. Russell then asked Adrian to kill Brown and his mother. Adrian agreed. Russell asked Lee to assist Adrian by calling him when Clarke and Brown were at home and by helping Adrian gain entry into the Clarke house. She agreed and Russell gave her a handful of crack cocaine.

On the evening of January 7, 1999, Lee called Russell's beeper number when she saw Clarke arrive home with

Brown. Adrian arrived at the house at 200 Earl Avenue shortly thereafter. Adrian and Lee crossed the street toward a car parked in front of the Clarke house. The defendant sat in the front seat of the car. Adrian told the defendant that he was going to "take care of business." The defendant then threatened Lee that he would kill her and all the residents at 200 Earl Avenue if she talked to anyone about the scheme to murder Clarke and Brown.

Lee and Adrian then proceeded to the Clarke house. After Lee rang the doorbell, Clarke answered and asked who it was. Lee said, "the girl across the street," and Clarke opened the door. Adrian forced his way in and fired a shot. Lee followed and saw Clarke and Brown run upstairs with Adrian in pursuit, shooting at them. He shot and killed Clarke in one of the bedrooms. Lee waited on the stairs and heard Brown calling for his mother. Adrian then went back into the hallway and shot Brown in the head, killing him. Adrian passed Lee as he went down the stairs and threatened to kill her if she said anything about what she had witnessed. He then exited the house. When Lee left the house shortly thereafter, both Adrian and the defendant's car were gone.

Later that day, Adrian, King and Kennedy went to the Stamford mall. Adrian told Kennedy that they were going to meet the defendant there because he was "stranded." After the group met the defendant at the mall, Adrian gave the defendant some money. Kennedy testified that the defendant was not stranded, but was using Russell's blue rental car. The next day, Ryan Peeler drove Russell to the Comfort Inn in Milford to meet Adrian. Ryan Peeler saw the defendant in the hotel parking lot.

After Russell was arrested for the murders, he told Keene to get the remaining money from the drug opera-

tion from Kennedy. She did so and gave a portion of it to the defendant.

Demetrius Geter, the defendant's half brother, testified that sometime after the murders he approached the defendant about procuring a gun. The defendant responded that the only gun he had access to had been used in a homicide and that Adrian had given it to him. Additional facts will be set forth as necessary.

## I

## IDENTIFICATION OF THE DEFENDANT AS THE DRIVER BY LEE

At trial, the defendant filed a motion to suppress Lee's out-of-court and in-court identifications of the defendant as the driver of the car that had been parked in front of the Clarke house before the murders. At the suppression hearing, the court determined that a photograph of the defendant that had been shown to Lee by James Lawton, an agent with the federal bureau of investigation in March, 1999, was unnecessarily suggestive.[5] Nevertheless, the trial court concluded that Lee's August, 1999 identification and her in-court identifications of the defendant were reliable under the totality of the circumstances and, therefore, denied the defendant's motion to suppress. The defendant claims that the trial court improperly admitted the identifications. We disagree.

The following evidence from the suppression hearing is relevant to our resolution of these claims. Lee testified that she had smoked crack cocaine on the day of the murders. The crack had not caused her to hallucinate, but had made her paranoid. It was dark when she left 200 Earl Avenue with Adrian and walked across the

[5] At the hearing, the state conceded that the photograph was unnecessarily suggestive because it was different from the other photographs shown to Lee in that it pictured the defendant with a woman in an outdoor setting.

street toward a car parked in front of the Clarke house. She was nervous. After Adrian briefly conversed with the driver, the driver threatened to kill Lee's entire household if she talked. Lee testified that she could see the driver and that he was familiar to her because she had seen him before at 200 Earl Avenue with Russell Peeler. She was 100 percent certain that the defendant was the driver of the car. Lee also testified that the police had never suggested to her that a car or driver had been present at the time of the murders, or that the defendant had been involved with the homicides.

After the murders, Lee gave three statements to the Bridgeport police, but she did not mention that she had been involved in the murders or that she had seen a car outside the Clarke house on the night of the murders. In March, 1999, Lee contacted Lawton and Ada Curet, a Bridgeport police officer who had been collaborating on the case, and indicated that she wanted to speak with them about the case. She did not say what she wanted to tell them. At the time, she was at a drug rehabilitation facility in Massachusetts. Both Lawton and Curet went to see Lee on March 12, 1999. During the meeting with Lee, Lawton showed her photographs of various individuals and asked her if she recognized them. Clarke had given the photographs to the police before her death. Curet testified that the purpose of showing Lee these photographs was not to identify accomplices in the homicide case, but to identify associates of Adrian and Russell for an ongoing federal narcotics investigation. Curet also testified that the authorities had no reason to suspect that the defendant had been involved in the homicides at that point in the investigation.

Lawton showed Lee the photographs in succession, one at a time, and asked her if she recognized anyone as he showed her each photograph. When Lawton showed Lee a photograph of the defendant, she said

that she recognized him, but she did not identify him by name. Lee also identified Adrian, Russell, King and Kennedy as persons she recognized in other photographs. During the same interview, Lee told the authorities for the first time about her involvement with the murders. On March 16, 1999, Lee gave another statement that set forth in greater detail the events of the night of the murder, including her involvement.

On August 5, 1999, Lawton and Curet again met with Lee at her request. During this interview, Lee first spoke of the presence of a driver in a car parked outside the Clarke residence just before the murders. Lee's lawyer was present. Curet and Lawton showed Lee an array of photograghs that included one of the defendant. Lee identified him and said that he had been sitting in a car parked in front of the Clarke house just before the murders. During the same interview, Lee also identified King from another array of photographs.

The state conceded that the photograph of the defendant that had been shown to Lee in March was unnecessarily suggestive. The trial court therefore analyzed whether Lee's subsequent identifications of the defendant were reliable in light of the totality of the circumstances pursuant to *Manson* v. *Brathwaite*, 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). The trial court concluded that Lee's August identification and any in-court identifications of the defendant were reliable.

"[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the

identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Citation omitted; internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 554–55, 757 A.2d 482 (2000).

"[R]eliability is the linchpin in determining the admissibility of identification testimony . . . . The factors relevant to determining the reliability of an identification include, but are not limited to, the following: the opportunity of the witness to view the criminal at the time of the crime; the witness's degree of attention; the accuracy of [the witness's] prior description of the criminal; the level of certainty demonstrated at the identification; the time between the crime and the identification . . . and the degree of contact or number of confrontations the witness had with the defendant prior to trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 555, 747 A.2d 487 (2000).

"[W]e examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court. . . . Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Citation omitted; internal quotation marks omitted.) *State* v. *Reid*, supra, 254 Conn. 555–56; see also *Manson* v. *Brathwaite*, supra, 432 U.S. 116.

Because the trial court found, and the state conceded, that the March identification procedure was unnecessarily suggestive, we turn to the second prong of the test to determine whether the identification was reliable under the totality of the circumstances. We conclude that it was.

Lee testified that she had a clear view of the defendant sitting in the car and that he spoke to her. Lee also testified that she had seen him previously, including the day before the murders, and that she was 100 percent certain that the defendant had been the driver of the car. Finally, there was testimony that Lee had volunteered this information in the presence of her attorney and that the authorities had had no preconceived notion that the defendant had been an accomplice to the homicides. Accordingly, we conclude that there was ample evidence adduced at the suppression hearing to support the reliability of Lee's identifications of the defendant after March, 1999.

The defendant claims that Lee could not have seen the defendant because Adrian was standing between Lee and the car, but Lee repeatedly testified that she had a clear view of the defendant. The defendant also claims that Lee's identifications were unreliable because Lee had consumed crack cocaine the day of the murders and because Lee could not give details about the defendant, such as whether he was fat or thin or wore a goatee, and could not give details concerning the make and model of the car. In light of the foregoing evidence, we conclude that Lee's drug use and inability to provide these details went to the weight of her identification testimony, not its admissibility.

Finally, the defendant claims that the eight month lag between the murders and Lee's August identification of the defendant undermined the reliability of her identifications. The United States Supreme Court has recog-

nized that a time lapse of that magnitude would "be a seriously negative factor in most cases"; *Neil* v. *Biggers*, 409 U.S. 188, 201, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); but the court in *Biggers* ultimately concluded that such a time lapse was not fatal when the witness was otherwise reliable. Id. In this case, because Lee had seen the defendant at her house prior to the murders, she was able to make a reliable identification of the defendant even after the passage of eight months' time. Moreover, this court has held that a lengthy time lapse alone does not automatically render an identification unreliable. See *State* v. *Ortiz*, supra, 252 Conn. 555 n.19. We therefore conclude that the trial court properly denied the defendant's motion to suppress the pretrial and in-court identifications of the defendant.

## II

## SUFFICIENCY OF THE EVIDENCE

The defendant next claims that his conviction of capital felony, murder and conspiracy must be vacated because the state failed to prove that the defendant: (1) aided Adrian Peeler in the commission of the murders, which was required to prove accessorial liability for murder and capital felony; (2) intended that Clarke and Brown be murdered, which was an essential element of both conspiracy and murder; and (3) agreed to commit the crime of murder, which was required for a conspiracy conviction.

The defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if

subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) Id. Because we conclude that the state proffered sufficient evidence to support the jury's convictions, the defendant has failed to satisfy the third prong of *Golding*.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . ." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 628–29, 835 A.2d 895 (2003).

"This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require

acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) Id., 629.

The jury was presented with tape recordings of the defendant's telephone conversations with associates while he was incarcerated after the murders of Clarke and Brown. The tape recordings contain the following statements made by the defendant:

"Although, I'm not the actual person, you know what I'm saying, that committed anything, uh, and, the way the lady got it was wrong; I, I wasn't even driving in the same car as him, you know what I'm saying. I explained that I was driving in another car like scoping out the area, you know what I mean, so whatever he's going to do, he, he, he's come clean doing it, you know what I'm saying. . . ."

"[A]s long as you do your thing and get away clean, then yeah, nobody's going to be under any pressure, but now man, uh, he made a blunder, by carrying out whatever he carried out in front of that, in the presence of a woman, who witnessed it, okay . . . ."

"Yo, look, the bottom line is this, I may have assisted, I mean, you know, I mean, it's like, uh, I mean, you

boys, you do favors for them, you know what I'm saying . . . ."

"But I'm saying this, right, truth is, I wasn't there on the scene with who did that. I know he did it, you know what I'm saying, but, I was in another car, I was in another rental car, you know what I'm saying, and I, and making sure that it was clear. That was it." The defendant also stated that he was "patrolling the area" and that "[h]e just told [me] to watch his back (pause) so I did."[6]

"[H]e came and he picked me up from East Avenue. . . . [H]e brought me over um, to his father uh, house where his brother was at and he gave me the keys for the car. And *he*, you know, *briefly ran down*, you know what I'm saying, *what he was trying accomplish*, you know, I'm like pshh, so I imagine, um, I mean it, it wasn't the most, uh, let me see, wise decision I could have made, I mean it's stupid . . . ." (Emphasis added.)

The jury also heard Lee's testimony that she had seen the defendant in front of the Clarke residence the day before the murders and that she had seen him in a car parked in front of the house just before the murders. Lee also testified that Adrian told the defendant that he was going to "take care of business" and that the defendant threatened her life if she spoke about what she was about to witness.

Keene testified that Russell had asked the defendant to kill the victims. Keene also testified that she gave the defendant money after the murders, at Russell's request. There was also evidence that the defendant

---

[6] The defendant claims that these conversations were so vague that it would have been speculative for the jury to conclude that the defendant was discussing the murders. We disagree. The jury was free to draw the reasonable and logical inference that the defendant was speaking about the murders and his involvement therein.

possessed the murder weapon after the murders had taken place.

The defendant first claims that the state failed to present sufficient evidence to establish that he aided Adrian in the commission of the murders and that he intended that the victims be killed as required to prove accessory liability for murder and capital felony. "The statutory provision governing accessory liability, General Statutes § 53a-8, provides in relevant part that [a] person, acting with the mental state required for the commission of an offense, who . . . intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct . . . as if he were the principal offender. We have previously stated that a conviction under § 53a-8 requires [the state to prove the defendant's] dual intent . . . [first] that the accessory have the intent to aid the principal and [second] that in so aiding he intend to commit the offense with which he is charged. . . .

"Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . This does not require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . . Nevertheless, because intent to cause the death of a person is an element of the crime [of murder] . . . that intent must be proven beyond a reasonable doubt. . . . Furthermore, [i]ntent to cause death may be inferred from . . . the events leading to and immediately following the death." (Citations omitted; internal

quotation marks omitted.) *State* v. *Turner*, 252 Conn. 714, 748–49, 751 A.2d 372 (2000).

We conclude that the jury reasonably could have inferred from the foregoing evidence that, at the time of the murders, the defendant was "scoping out" the area around the Clarke residence for witnesses, that he knew Adrian's purpose was to kill Clarke and Brown, and that he believed that watching for witnesses would help Adrian by preventing any interruption of the murder plan and by facilitating Adrian's escape. We further conclude that the jury reasonably could have inferred from this conduct that the defendant intended to cause the deaths of Clarke and Brown. Accordingly, we reject this claim.

The defendant also claims that the state failed to prove that the defendant agreed to aid Adrian and Russell, as required for his conspiracy conviction. "To establish the crime of conspiracy under [§ 53a-48], the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy . . . . The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." (Citation omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 226–27, 733 A.2d 156 (1999).

"Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . Indeed, a conspiracy can be inferred

from the conduct of the accused . . . and his coconspirator, as well as from the circumstances presented as evidence in the case." (Citations omitted; internal quotation marks omitted.) Id., 227.

We conclude that the evidence supporting the murder charges was sufficient to support the defendant's conviction for conspiracy to commit murder. The defendant stated in the recorded telephone conversations that Adrian had asked him to "watch his back" and that he had agreed to do so. The jury also reasonably could have inferred from the defendant's actions at the time of the murders that an agreement between Adrian and the defendant existed. We have already concluded that there was sufficient evidence to support the jury's finding that the defendant intended to cause the deaths of Clarke and Brown. Accordingly, there was sufficient evidence to support the defendant's conviction of conspiracy.

## III

## ACCESSORY LIABILITY WHEN THE PRINCIPAL HAS BEEN ACQUITTED

We next address the defendant's claim that the court improperly denied his motion to dismiss the charges of murder and capital felony against him on the ground that Adrian's acquittal of those charges precluded the defendant's conviction of those offenses. We disagree.

The defendant argued to the trial court that General Statutes § 53a-9 did not abrogate the common-law rule that the conviction of a principal is a necessary condition precedent to the conviction of an accessory. The trial court determined that this issue was controlled by *State* v. *Solek*, 242 Conn. 409, 699 A.2d 931 (1997), in which this court held that an accessory could still be charged with capital felony even though there was a finding of no probable cause with respect to the princi-

pal. Id., 426–28. The trial court rejected the defendant's attempt to distinguish *Solek* on the ground that the jury found insufficient evidence of capital felony in Adrian's case, as opposed to the finding of no probable cause in *Solek.*

The defendant claims on appeal that: (1) under *State v. Hope,* 203 Conn. 420, 524 A.2d 1148 (1987), the conviction of an accessory is prohibited when the principal has been acquitted in a separate trial; and (2) the state was collaterally estopped from relitigating the issue of whether Adrian was the shooter.

We begin by addressing the standard of review with respect to this issue. Whether a defendant may be committed as an accessory when the principal has been acquitted under § 53a-9 is a "question of statutory interpretation over which our review is plenary." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Planning & Zoning Commission,* 266 Conn. 338, 345, 832 A.2d 611 (2003).

Section 53a-9 provides in relevant part: "In any prosecution for an offense in which the criminal liability of the defendant is based upon the conduct of another person under section 53a-8 it shall not be a defense that . . . (2) such other person has not been prosecuted for or convicted of any offense based upon the conduct in question, or *has been acquitted thereof,* or has legal immunity from prosecution therefor . . . ." (Emphasis added.)

Despite this clear statutory language, the defendant claims that *Hope* requires the conviction of the principal as a necessary predicate to the conviction of an accessory. The defendant implies that *Hope* stands for the proposition that § 53a-9 did not abrogate the common-law rule that conviction of a principal was a necessary predicate for the conviction of an accessory.

In *Hope*, "the state charged [the defendant] pursuant to an accessory theory of liability, with capital felony (murder for hire) in violation of § 53a-54b (2). [*State* v. *Hope*, supra, 203 Conn. 421]. In the second count of the indictment, the state alleged that Geraldine Burke had hired John J. McGann, for his pecuniary gain, for the purpose of causing the death of her husband, Donald C. Burke. Id., 422. The second count alleged further that Donald Burke was murdered by a person or persons, including [the defendant], which person or persons, with intent to cause the death of Donald Burke, did cause the death of Donald Burke. Id. The trial court dismissed the second count of the indictment for failure to allege the essential elements of capital felony and the state appealed to this court. Id. During the pendency of the state's appeal, we decided *State* v. *McGann*, 199 Conn. 163, 506 A.2d 109 (1986). In that case, the trial court had found McGann guilty of capital felony for his role in the murder of Donald Burke. Id., 164. On appeal, however, we concluded that McGann could not be convicted of capital felony because, in view of the evidence presented by the state at trial, the hiring relationship required by § 53a-54b (2) was not present. Id., 176–78. In other words, we concluded as a matter of law that § 53a-54b (2) did not encompass the factual circumstances presented in the case." *State* v. *Solek*, supra, 242 Conn. 424–25.

"As a consequence of our decision in *McGann*, we dismissed the state's appeal in *Hope* as moot. *State* v. *Hope*, supra, 203 Conn. 425. We stated that '[a]s the state acknowledges, [the defendant] can no longer be tried on a charge of capital felony murder in light of our determination that McGann was not a hired assassin under the terms of § 53a-54b (2). . . . [The defendant] cannot be held liable as an accessory on [the capital felony] charge *in the absence of evidence that anyone*

*else committed a capital felony murder.'* " (Emphasis added.) *State* v. *Solek,* supra, 242 Conn. 425.

In *Solek,* we clarified our holding in *Hope.* The defendant in *Solek* had been charged with, inter alia, capital felony (murder committed in the course of the commission of a sexual assault in the first degree) in violation of General Statutes (Rev. to 1997) § 53a-54b (7). *State* v. *Solek,* supra, 242 Conn. 411. The trial court had construed the information as charging the defendant with capital felony on the basis of an accessory theory of liability. Id., 425. The trial court had also determined that, pursuant to *Hope,* the defendant could not properly be charged as an accessory because the trial court had not found probable cause with respect to the principal. Id., 425–26. "The trial court concluded that [the] finding of no probable cause had the same preclusive effect on what it believed to be the state's accessory case against the defendant that our conclusion in *McGann* had on the state's accessory case against Hope." Id., 426.

On appeal, this court concluded that *Hope* stood for the more limited principle that if, as a matter of law, the evidence was legally insufficient to show that *any* capital felony had occurred, the accessory could not be charged with it. Id. Because the finding of no probable cause in *Solek* was not a determination that, as a matter of law, no one had committed the offense of capital felony, the defendant could still be charged and convicted as an accessory. Id., 426–27.

The defendant's attempt to distinguish *Solek* from the present case and to apply *Hope* rests on his misconstrual of the key difference between the two cases, namely, the factual insufficiency present in *Solek* and the legal insufficiency present in *Hope.* The defendant attempts to distinguish *Solek* on the ground that, in the present case, the principal, Adrian, was acquitted due to insufficiency of the evidence, not because of a finding

of no probable cause. Both *Solek* and the present case involve findings of factual insufficiency, however. There is no claim that a capital felony was not committed. Accordingly, we reject this claim. For the same reasons, we reject the defendant's argument that *Hope* stands for the principle that the conviction of an accessory is prohibited when the principal has been acquitted in a separate trial.[7]

We also decline the defendant's invitation to exercise our supervisory powers to conclude that when the principal is acquitted of the crimes charged, the defendant cannot be guilty of those same crimes unless the state can present additional evidence of the principal's guilt.[8] "Historically, the exercise of this court's supervisory powers has been limited to the adoption of judicial procedures required for the fair administration of justice. We never have invoked these powers to pronounce on a rule of substantive law, much less to overrule a substantive legislative enactment, and we decline to engage in such an extraordinary—and almost certainly unlawful—exercise of our authority in the present case." *State* v. *Higgins*, 265 Conn. 35, 61, 826 A.2d 1126 (2003).

The defendant also claims that the state was collaterally estopped from relitigating the issue of whether Adrian was the shooter during the murders. The defendant admits that this claim is unpreserved and seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. Because the defendant has failed to demonstrate that

---

[7] Our determinations both in *Solek* and the present case are consistent with the law governing the crime of conspiracy. One coconspirator may be held liable even though the other has been acquitted in a separate trial due to factual insufficiency. *State* v. *Colon*, 257 Conn. 587, 602–604, 778 A.2d 875 (2001).

[8] We also note that in this case there was additional evidence of the defendant's guilt not admissible during Adrian's trial, namely, the defendant's recorded telephone conversations.

any impropriety occurred, much less impropriety of constitutional magnitude, we conclude that he has failed to meet the third prong of *Golding*.

The doctrine of collateral estoppel "is a judicially created rule of reason that is enforced on public policy grounds." (Internal quotation marks omitted.) *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 58–59, 808 A.2d 1107 (2002). "The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of former judgments and finality." (Internal quotation marks omitted.) Id., 58. As a general rule, "[a]pplication of the doctrine of collateral estoppel is neither statutorily nor constitutionally mandated." Id.

"In a criminal case, [however], collateral estoppel is a protection included in the fifth amendment guarantee against double jeopardy. . . . Collateral estoppel means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (Citations omitted; internal quotation marks omitted.) *State* v. *Knight*, 266 Conn. 658, 663–64, 835 A.2d 47 (2003).

As we have noted, General Statutes § 53a-9 provides that "it shall not be a defense [to a charge of criminal liability for the acts of another] that . . . [the principal] has been acquitted [of the offense with which the accessory is charged]." Thus, the statute clearly abrogates the judicially created doctrine of collateral estoppel to the extent that the doctrine would preclude a retrial of the *issue* of the principal's guilt. The constitution embodies this doctrine only to the extent that it precludes a retrial of a *defendant*. Because the defendant in the present case has not previously been tried for these offenses, the double jeopardy clause is not implicated. Accordingly, we reject this claim.

## IV

## JURY INSTRUCTION ON *PINKERTON* LIABILITY

The defendant next claims that the trial court improperly instructed the jury as to conspiratorial liability pursuant to *Pinkerton* v. *United States*, supra, 328 U.S. 640, because: (1) the application of the *Pinkerton* doctrine under the facts of the case violated his due process rights; and (2) the application of the *Pinkerton* doctrine to a capital felony violated his due process rights. We disagree.

The defendant concedes that this issue was not preserved and seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. Because we conclude that the trial court's *Pinkerton* instruction was proper, the defendant's claim fails the third prong of *Golding*.

The standard of review for claims of instructional impropriety is well settled. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 536–37, 679 A.2d 902 (1996).

We set forth the development of this state's *Pinkerton* jurisprudence in the recent case of *State* v. *Coltherst*,

263 Conn. 478, 820 A.2d 1024 (2003). "This court first explicitly adopted the *Pinkerton* principle of vicarious liability for purposes of our state criminal law in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993). Under the *Pinkerton* doctrine, which, as of the date of our decision in *Walton*, was 'a recognized part of federal criminal conspiracy jurisprudence'; id., 43; 'a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy.' Id., citing *Pinkerton* v. *United States*, supra, 328 U.S. 647–48. The rationale for the principle is that, when 'the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct.' *State* v. *Walton*, supra, 46." *State* v. *Coltherst,* supra, 263 Conn. 491.

"We concluded in *Walton* that the *Pinkerton* principle was applicable in state criminal cases, reasoning, 'first, that *Pinkerton* liability is not inconsistent with our penal code and, therefore, that we were not prohibited from recognizing that theory of criminal liability as a matter of state common law. See General Statutes § 53[a]-4. Without foreclosing the use of the *Pinkerton* doctrine in other circumstances, we then concluded that application of the doctrine was appropriate in *Walton*, in which [1] the defendant was a leader of the conspiracy, [2] the offense for which vicarious liability was sought to be imposed was an object of the conspiracy and [3] the offense was proved by one or more of the overt acts alleged in support of the conspiracy charge.' " *State* v. *Coltherst*, supra, 263 Conn. 491–92.

"In *State* v. *Diaz*, supra, 237 Conn. 518, we were required to 'decide whether to extend the principle of vicarious liability that we adopted in *Walton* to a case in which not all of [the three *Walton*] conditions [had] been met, a question that we expressly reserved in *Walton*.' Id., 527. In *Diaz*, the defendant had been convicted of, inter alia, murder under the *Pinkerton* doctrine and conspiracy to commit murder. Id., 519–20. The evidence showed that the defendant, along with several other individuals, had fired multiple gunshots into a motor vehicle occupied by the victim and three others. Id., 522–23 and n.7. The victim was struck and killed by a single bullet. Id., 523. The defendant claimed on appeal that the court's instruction under the *Pinkerton* doctrine had been improper because, among other reasons, it was broader than the limited version of the doctrine recognized in *Walton*. Id., 525–26. This court acknowledged that the state had not proved that the defendant was the leader of the conspiracy to ambush the vehicle and its occupants and, thus, had not established the first condition for *Pinkerton* liability set forth in *Walton*. Id., 529. We noted, however, that 'the evidence reasonably established that the defendant was a fully engaged member of the conspiracy who had actively participated in the shooting and that he, along with his coconspirators, intended to kill one or more of the vehicle's passengers.' Id. We concluded that 'where . . . the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for such criminal conduct.' Id. We further concluded that '*Pinkerton* liability may be imposed even if *none* of the three *Walton* conditions is present.' . . . Id., 527." (Emphasis in original.) *State* v. *Coltherst*, supra, 263 Conn. 492–93.

"We also acknowledged, however, that 'there may be occasions when it would be unreasonable to hold a defendant criminally liable for offenses committed by his coconspirators even though the state has demonstrated technical compliance with the *Pinkerton* rule. . . . For example, a factual scenario may be envisioned in which the nexus between the defendant's role in the conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator. In such a case, a *Pinkerton* charge would not be appropriate.' . . . [*State* v. *Diaz*, supra, 237 Conn. 530]." *State* v. *Coltherst*, supra, 263 Conn. 493.

To the extent that the defendant argues that it would be unfair to apply *Pinkerton* because his role in the conspiracy was too attenuated, we disagree. The evidence demonstrated his assistance in planning the conspiracy, his awareness of what was about to take place when Adrian approached the Clarke house, and his assistance as a lookout during the murders. We conclude, therefore, that the extent of the defendant's participation was not "so attenuated or remote . . . that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator." *State* v. *Diaz*, supra, 237 Conn. 530.

The defendant's remaining claim that the *Pinkerton* doctrine is not applicable in cases involving capital felonies is also without merit. In *State* v. *Coltherst*, supra, 263 Conn. 500–502, this court determined that a murder conviction obtained pursuant to the *Pinkerton* doctrine could serve as the predicate for a capital felony conviction. As the defendant does not raise any novel claim in this respect, we decline to revisit the issue.

We conclude, therefore, that the trial court properly instructed the jury with respect to the *Pinkerton* doctrine.

The judgment is affirmed.

In this opinion the other justices concurred.